## FRIEDMAN v. DELANEY, Collector.

### No. ·4372.

United States Court of Appeals
First Circuit.

Dec. 13, 1948.

Lee M. Friedman, of Boston, Mass. (Sidney Werlin and Friedman, Atherton, King & Turner, all of Boston, Mass., on the brief), for appellant.

Sumner M. Redstone, Sp. Asst. to the Atty. Gen. (Theron L. Caudle, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson, and Robert M. Weston, Sp. Assts. to the Atty. Gen., and William T. McCarthy, U. S. Atty., and W. Arthur Garrity, Jr., Asst. U. S. Atty., both of Boston, Mass., on the brief), for appellee.

.Before MAGRUDER, Chief Judge, W O O D B U R Y, Circuit Judge, and PETERS, District Judge.

PETERS, District Judge.

In this suit the plaintiff taxpayer seeks to recover the sum of $3,411.47, the amount by which his income tax for the year 1941 was increased by reason of the refusal of the Commissioner to allow the deduction of an item of $5000, claimed in the income tax return to be a bad debt, but now asserted to be allowable as a business expense or a loss incurred in business. There is no dispute about the facts.

It appears that the plaintiff, Mr. Friedman, a Boston lawyer of long experience, had a valued client in whom he had confidence, one Louis H. Wax, whose proposed composition in bankruptcy required the deposit in court of the sum of $7000. The record shows that Mr. Friedman made this deposit in February, 1938, accompanying it with a caveat to the effect that no part of the money came from Wax or his estate. In November, 1939, Mr. Friedman entered a petition in bankruptcy court alleging "that the money deposited for the proposed composition, which has been abandoned," was deposited by him and was not the property of the bankrupt, and asking that it be ordered returned. The petition was denied in November, 1941, and thereupon Mr. Friedman filed an undertaking that he would not further oppose transfer of the money to the trustee in bankruptcy, at the same time alleging that slightly over $5000. of the amount deposited was his own money.

It seems that the reason Mr. Friedman furnished this money from his own funds in the bankruptcy proceeding was because, in conversations with attorneys for creditors, when he was urging the acceptance of the proposed composition, he had personally assured them that the money to carry it out would be forthcoming. He did this without informing Mr. Wax and without intending to subject him to any legal liability, presumably feeling certain that the money would be obtained from a certain life insurance policy, which he had in his possession. This policy on the life of Wax, payable to his wife, could be pledged for $5000, but when it came to that point Mr. and Mrs. Wax refused to have it so used, which left Mr. Friedman in the breach. Commendably

recognizing his moral obligation, in view of the assurances he had given, he paid the money to the clerk of the bankruptcy court.

The question presented is whether the $5000, which the plaintiff in his complaint alleged was "lost by him in connection with the bankruptcy proceedings of one Louis H. Wax", and which he claimed as a deduction from income in his return for 1941, was wrongfully disallowed by the Commissioner, the plaintiff now claiming that it should have been allowed as an ordinary and necessary expense in carrying on business under Section 23(a) (1), or a loss incurred in business under Section 23(e) (1), of the Internal Revenue Code, 26 U.S.C.A. § 23(a) (1), (e) (1).

The parties are in agreement that the plaintiff, to recover, must show the applicability of one or the other of those Sections. We agree with the District Court that he has failed to do so.

The plaintiff contends that the loss of the amount in question was due to his keeping his word, which the ethics of his profession, as well as his own conscientiousness compelled him to do, and argues that consequently the payment was made and the loss incurred in his law business, and should have been allowed as a deduction from income under one or the other of the sections referred to. His position is illustrated by his rhetorical question: Is it not part of a lawyer's business to keep his word? It might be answered that it is everybody's business to do so, but that is wide of the mark. We are obliged to inquire whether the circumstances of this loss—no matter how creditably incurred—are clearly within the coverage of either Section referred to. Nor can equitable considerations be allowed to control. The matter of deductions from income " * * * 'depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed.' " Deputy v. Du-Pont, 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416.

It is necessary to consider the origin of the obligation under which the taxpayer considered himself to be under when he

made the payment in question, in determining whether it is a permissible deduction under either Section of the statute. It arose from the gratuitous assurance given attorneys for creditors of Wax by Mr. Friedman that the money for the composition would be forthcoming if they would approve it. In effect, it was the voluntary underwriting of the obligation of another. It was, of course, the duty of the client to furnish the money, not of his attorney. Payment of the $5000. by the attorney was made as a consequence of his undertaking and in pursuance of it and was no less voluntary than the assurance which occasioned it. From any point of view his loss was caused by his voluntary action.

■ As was said by this Court in the very similar case of W. F. Young, Inc., v. Commissioner, 120 F.2d 159, 166, "Even if the credit and reputation of the taxpayer would have been improved by these payments and even though they would in any way benefit the taxpayer, voluntary payments are not deductible as ordinary and necessary business expenses or losses." See also Robinson v. Commissioner, 8 Cir., 53 F.2d 810, 79 A.L.R. 975.

The emphasis placed by the plaintiff upon his moral obligation to keep his professional word should not obscure the fact that the transaction on his part was voluntary from the beginning.

That the circumstances of the taxpayer's payment preclude its being considered either an "ordinary and necessary expense" of his business or a loss incurred in business is clear both from the Regulations promulgated under the Internal Revenue Code and the construction Section 23(a) (1) and Section 23(e) (1) have received by the Courts.

■ The business expenses covered by the former Section are limited to those described as being "ordinary and necessary"; such as are directly connected with and proximately resulting from carrying it on; those normally originating in a liability created in the course of its operation. Deputy v. Du Pont, supra. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212.

The moral obligation which the taxpayer recognized here, to his financial detriment, was an extra-professional liability which resulted in a loss which is certainly not clearly covered by Section 23(a) (1) according to the accepted construction of that Section.

Nor is the taxpayer in any better case if he claims a deductible loss under Section 23(e) (1). His was not a business loss made in carrying on a law practice. It is obviously no part of a lawyer's business to take on a personal obligation to make payments which should come from his client, unless in pursuance of a previous understanding or agreement to do so. The voluntary nature of the action, resulting in the loss, takes it outside of this Section as well as the other. W. F. Young v. Commissioner, supra. Robinson v. Commissioner, supra.

It should be said that we also see no error in the finding of the District Court that the payment of the $5000—if ever a proper deduction—was deductible only in 1938, when made, and not in 1941, when the taxpayer failed in an attempt to get it back. It is admittedly not a debt due the taxpayer which became "bad". The deposit was made without restriction of destination and was, for all practical purposes, gone and lost to the owner when made.

The action of the District Court in giving judgment for the defendant on the claim in the complaint for the item of $3,411.47 is affirmed.

It appears however from a stipulation filed by counsel that plaintiff's right to a refund of the sum of $235.19, as an overpayment of his tax liability for 1941, is conceded by the defendant. This was an item covered by a separate claim in the complaint and is not referred to in the opinion or the judgment of the District Court. The plaintiff is entitled to judgment for the amount of this claim, with costs.

The judgment of the District Court is vacated and the case is remanded to that court with direction to enter judgment for the plaintiff in the amount of $235.19 with costs in that court.

MAGRUDER, Chief Judge.

I concur in the result. But I would stress certain additional facts which apparently have not been regarded as significant either by the district court or by my brethren.

The taxpayer Friedman had an old and valued client, Wax, in whose integrity and ability he had complete confidence. Wax lost everything during the depression. Early in 1937 the Malden Trust Company, which held a chattel mortgage on Wax's hardware store, foreclosed the mortgage and bought in the stock of merchandise. Wax entered into negotiations with Gofman and Kaufman, who owned the controlling interests in Gofkauf's Stores, Inc., operator of a chain of hardware stores. The business proposition under contemplation was that Gofkauf's Stores, Inc., would acquire the stock of merchandise from the Malden Trust Company and install Wax in his old hardware store as manager for Gofkauf. Wax was also to be buying agent for the Gofkauf chain. In connection with this negotiation, Gofman and Kaufman insisted "that Wax should be in a position where he wouldn't be bothered by creditors, so that he would have to make some settlement with his creditors in order to be able effectively to take up the details of his new position."

Accordingly, on March 12, 1937, Wax addressed a letter to his creditors offering them ten cents on the dollar in full settlement. On the same day Gofman and Kaufman sent a letter to Wax's creditors explaining their plan for employing Wax as manager of his old hardware store, which they intended to develop "into a larger and more successful proposition", and urging the creditors to accept Wax's offer as a fair one and the best that could be done under the circumstances. Shortly thereafter five of Wax's smaller creditors filed an involuntary petition in bankruptcy against him. On April 28, 1937, Friedman's firm as attorneys for Wax sent a letter to Wax's creditors stating that so many creditors had already accepted the offer of settlement, "that it has led Mr. Wax to continue in his desire to put through this settlement, and he has authorized us to say that he would

make such an offer in composition proceedings under the present bankruptcy petition."

Gofman and Kaufman agreed to put up $2000 toward the proposed composition settlement. The balance of $5000 was to be raised on an insurance policy on the life of Wax, payable to his wife. Wax and his wife both told Friedman that they would agree to the use of the policy for this purpose. The policy was delivered into Friedman's hands. Being completely confident that the money would be forthcoming, Friedman did his best to persuade the creditors to accept the composition offer. In the course of this effort he assured attorneys for various of the creditors that funds would be available to fulfill the terms of the offer, if accepted by the creditors. He made a similar assurance to the referee in bankruptcy. According to his testimony, "I made the statement in open court that if this composition was accepted and confirmed, I could assure the court that the money was there to put it through. I never made a statement to the court that I personally would pay the money. I never said that to the court. But I said I was in a position to give the court the assurance that if that composition was accepted and confirmed, that the money was available for carrying it through."

However unfortunate the giving of this assurance may appear in retrospect, under the circumstances at the time it seems to me a natural, certainly not an extraordinary, thing for Friedman to have done in the service of his client. And having given the assurance, I further think it was not unreasonable for Friedman to regard it as a matter of professional honor, in the maintenance of his good will and standing at the bar, to make good on that assurance.

The referee insisted that a deposit be made to cover the proposed composition. Gofman and Kaufman handed over to Friedman the $2000 they had agreed to contribute. When Friedman went to Wax to get him to raise $5000 on the life insurance policy, as he had previously indicated his willingness to do, Wax said that in justice to his wife and children he could not do that, for it was the only resource he had left wherewith to feed and support them. At

this time, apparently, his negotiations with Gofman and Kaufman had stalled, and the prospect of an early employment by Gofkauf's Stores, Inc., was not so bright. Friedman therefore, on February 17, 1938, took $5000 of his own money, and adding it to the $2000 put up by Gofman and Kaufman, made the deposit with the clerk of the district court for the purpose aforesaid. At the time of making the deposit, Friedman filed a caveat reciting that no part of the said fund had been paid or contributed by the alleged bankrupt, and further that none of it was a part of the estate of the alleged bankrupt.

If these were all the relevant facts, I should hate to have to hold that the payment of $5000 by Friedman under the circumstances stated was not an "ordinary and necessary" expense paid in carrying on his professional business. The statutory language is pretty flexible. Cf. Welch v. Helvering, 1933, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212: "One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle." I do not think that the fact that the making of the deposit was "voluntary", in the sense that it was not in pursuance of an enforceable legal obligation, is conclusive against deductibility. Dunn & McCarthy, Inc., v. Commissioner, 2 Cir., 1943, 139 F.2d 242. See A. Harris & Co. v. Lucas, 5 Cir., 1931, 48 F.2d 187. "Whether an expenditure is directly related to a business and whether it is ordinary and necessary are doubtless pure questions of fact in most instances." Commissioner v. Heininger, 1943, 320 U.S. 467, 475, 64 S.Ct. 249, 254, 88 L.Ed. 171. Hence the finding of the district court in the present case that the payment was not an ordinary and necessary expense incident to Friedman's practice of law would have to be accepted by the appellate courts unless "clearly erroneous." In view of the further facts to which I shall now advert, I think that on the record as a whole it would have been improper to find that the $5000 item was an ordinary and necessary business expense.

To prevail in this case, the taxpayer of course had to show that the claimed "ordinary and necessary" business expense was paid or incurred in the taxable year 1941. His theory, therefore, must have been that though he made the $5000 deposit in 1938, it was not until 1941 that the money was irretrievably applied to the purpose for which the deposit had been made.

As already stated, Friedman made the deposit to make good on his assurance that funds would be available to satisfy a composition of ten cents on the dollar if Wax's creditors should accept the offer of settlement. That was the only purpose of the deposit; and that was the full extent of the professional obligation of honor which Friedman scrupulously recognized. Friedman certainly had no obligation, moral or legal, to make a general and unrestricted contribution to the bankrupt estate out of his own pocket. The caveat filed at the time the deposit was made expressly stated that the deposit was not part of the estate of the bankrupt; and though the caveat did not specify the restricted purpose of the deposit, there is no doubt as to what that purpose was. This purpose was acknowledged by the trustee in a petition filed by him later in the proceedings.

Now it appears from the record that the proposed composition was never effectuated and that Friedman's $5000 was never applied to the limited purpose for which the deposit had been made. Upon the failure of the composition proposal, Wax was adjudicated a bankrupt. Shortly thereafter, on October 31, 1939, Friedman petitioned the referee for the return to him of the money he had deposited "for the proposed composition which has been abandoned." So far as I can see, Friedman was clearly entitled to the return of the deposit upon the frustration of the purpose for which it had been made. But for some reason that does not appear, the referee delayed action on Friedman's petition for the return of his deposit.

Meanwhile, the trustee in bankruptcy, in an endeavor to gather in some assets for the bankrupt estate, had commenced a suit in equity against the Malden Trust Company, and others, attacking the validity of

the foreclosure proceedings. After some negotiations in which the trustee, the Malden Trust Company, Friedman, and others participated, a compromise agreement was worked out under which the trustee agreed to accept from the Malden Trust Company the sum of $4000 in full settlement of the equity suit; and as part of the compromise Friedman agreed not to press his petition for the return to him of the $5000 deposit and not to oppose the entry of an order by the referee extinguishing Friedman's claim to the deposit and transferring it to the trustee in bankruptcy for the general purposes of the bankruptcy administration.

On October 23, 1941, the trustee filed with the referee a petition for approval of the aforesaid compromise. The petition contained the following recital: "Earlier in these proceedings in bankruptcy, to wit, before adjudication, the bankrupt made a composition offer to his creditors of ten per cent (10%) in cash. Pursuant to the then requirements of the Bankruptcy Act, a deposit of $7,000. was made to defray the requirements of said composition; but the composition was not confirmed and the bankrupt was adjudicated." Further, the petition recited that, as part of the compromise settlement, Friedman had agreed to relinquish to the estate of the bankrupt his interest in the deposit. On November 10, 1941, Friedman filed with the court an agreement for entry of decree, referring to the trustee's petition for approval of the compromise, declaring that the $5000 on deposit was "my own money", but declaring further that upon condition of the entry of an order by the referee approving the compromise set forth in the trustee's petition, he did not further oppose the entry of an order directing that the said $5000 be transferred to the trustee in bankruptcy. Thereupon, the referee entered his order approving the petition of the trustee, and pursuant to Friedman's agreement he disallowed Friedman's petition for return of the deposit. Then and there Friedman lost his $5000.

The record is silent as to the reasons which led Friedman to agree in 1941 that the $5000 deposit (to the return of which he was clearly entitled upon the failure of its purpose) should be turned over to the trustee in bankruptcy to be dealt with without restriction as part of the bankrupt's estate. This agreement does not appear to have been related in any way to the assurances which Friedman had given to the referee and to attorneys for Wax's creditors back in 1937 as a result of which Friedman had felt morally bound to make the deposit so that funds would be available to satisfy the proposed agreement of composition then pending. As above stated, the composition was never consummated and Wax was adjudicated a bankrupt. Friedman's relinquishment in 1941 of his claim for refund of the $5000 deposit can therefore not be deemed to have been an ordinary and necessary expense by way of fulfilling a professional commitment made in the course of his practice of the law—which is the main ground urged by Friedman in support of his claim that the $5000 item was properly deductible. Nor was the $5000 item deductible under I.R.C. §23(e)(1) as a "loss" incurred in trade or business. The record contains no basis for a finding that it was part of Friedman's business as a practicing lawyer to contribute $5000 of his own money to the bankrupt estate of his client Wax in order to induce the trustee in bankruptcy to accept a compromise settlement of the claim of the estate against the Malden Trust Company.