UNION FISHERMEN'S COOPERATIVE
PACKING CO.

v.

EARLE, Former Collector of Internal
Revenue.

UNION FISHERMEN'S COOPERATIVE
PACKING CO.

v.

MALONEY, Former Collector of
Internal Revenue.

Civ. Nos. 6868, 6988.

United States District Court
D. Oregon.

April 28, 1954.

Randall S. Jones and Jacob, Jones &
Brown, Portland, Or., for plaintiff.

Leland T. Atherton, Sp. Asst. to the
Atty. Gen., for defendants.

SOLOMON, District Judge.

Plaintiff, Union Fishermen's Cooper-
ative Packing Company, an Oregon cor-
poration, instituted these actions pur-
suant to 28 U.S.C.A. § 1340 to recover
from the Collector $7,571.26 of its paid
income and excess profits tax for 1944
(Civil 6988) and $10,083 of its paid in-
come and excess profits tax for 1945
(Civil 6868).

Plaintiff alleges that it accrued an ob-
ligation in 1944 to pay its supplying in-
dependent commercial fishermen $9,-
380.61 more than the ceiling price for
the raw fish supplied and that it ac-
crued a similar obligation in 1945 to pay
the fishermen $10,472.61. Plaintiff al-
leges that these amounts, which have
never been paid, are properly allocable
in such years to either cost of goods sold
or ordinary and necessary business ex-
penses. The recovery sought represents
the tax refunds which would be allowed
if plaintiff establishes that it incurred
an obligation to pay such amounts. De-
fendant denies that such obligations ac-
crued within the meaning of the Inter-

nal Revenue Code, 26 U.S.C.A., in either 1944 or 1945.

Plaintiff was organized in 1896 as a private corporation. While plaintiff has always operated as a semi-cooperative, it has never reorganized as a legal cooperative after the corporation laws of the State of Oregon permitted it to do so. It maintains a plant in the city of Astoria, Oregon. It purchases raw fish from independent commercial fishermen who are free to sell their fish to any packer on the Columbia River. Plaintiff employs and purchases fish from both shareholders and non-shareholders alike.

A major problem of plaintiff's management after organization was the maintenance of a steady supply of raw fish from independent fishermen. Since plaintiff did not and does not operate its own vessels, it was a business necessity to develop and maintain the loyalty of commercial fishermen. At some date shortly after its organization, plaintiff instituted a policy of distributing at the end of each season bonuses to the fishermen. Plaintiff did not leave the total bonus to be paid all the fishermen to annual determination but, instead, instituted a policy of having the total annual bonus equal the total annual dividends to shareholders, which policy was publicized among all the fishermen on the River. As a result, plaintiff has developed and maintained, over a period of many years, the loyalty of the independent commercial fishermen in the area.

In addition to custom, plaintiff alleges that its liability for the years 1944 and 1945 accrued pursuant to Articles XXVII and XXVIII of the by-laws as amended on February 1, 1937, and February 19, 1945.
The pertinent portion of such articles after the 1937 amendment provided:

"Article XXVII
"Dividends

"The Board of Directors of this corporation may declare dividends annually, or at such time as they deem advisable, out of the net profits of the operations of this company, or out of any surplus which may exist, in such an amount annually as in their judgment shall be deemed advisable, appropriate and necessary.

"Article XXVIII
"Method of Paying Fishermen and Payment of Dividends

"Section 1. The fishermen fishing for this company shall receive annually the regular, seasonal going canners' price on the Columbia River, which shall be determined and paid accordingly for each season.

"Section 2. Whenever the Board of Directors shall declare a dividend, as provided for under the provisions of Article XXVII of these By-laws, then and in that event, an amount equal to such dividend shall be paid by distributing among the fishermen such sums as the value of each fisherman's spring season's delivery to the company of Chinook, Blueback and Steelheads bears to the entire amount of such dividend, and provided always that whenever a dividend is declared by the Board of Directors to the stockholders, an equal amount must at all times be paid to the fishermen and distributed in the manner hereinbefore set forth, and provided further that whenever the fishermen are paid an amount over and above the regular going seasonal river price, an equal amount in dividends must be paid to the stockholders of this company.

"Section 3. All declared stock dividends and all declared distribution of moneys to fishermen, as provided for in Section 1 of this Article, shall be declared and paid before July 1st of the following year for which the same is declared."

Sections 1 and 2 of Article XXVIII as amended on February 19, 1945, provide that:

"Section 1. The fishermen fishing for this corporation, shall receive annually, the regular seasonal going canners price which shall be determined and paid accordingly for each season.

"Section 2. Whenever the Board of Directors shall declare a dividend, as provided for under the provisions of Article XXVIII of these By-laws then and in that event, an amount equal to such dividend shall be paid by distributing among the fishermen such sums as the value of each fisherman's seasonal poundage delivery value bears to the entire amount of such dividend, provided, however that the judgment of the Board of Directors as to the kind and character of fish to be paid for shall be final, it being the intention that such amounts so distributed, as herein provided for, shall only be distributed to fishermen delivering to the company fish on which a processing profit has been realixed (sic-realized), and provided always further that whenever a dividend is declared by the Board of Directors to the stockholders, an equal amount must at all times be paid to the fishermen, as hereinbefore stated, and distributed in the manner hereinbefore set forth, and provided further that whenever the fishermen are paid an amount over and above the regular going seasonal price, an equal amount in dividends must be paid to the stockholders of this company."

Plaintiff alleges that, except as amended, Article XXVIII has been in force from 1937 to the present time.

Under the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., the Office of Price Administration (OPA) issued Maximum Price Regulation 418, which established the maximum price at which raw salmon may be sold by and purchased from fishermen. This regulation became effective July 13, 1943.

During the fall of 1943, plaintiff, although desirous of paying the bonuses provided for in Article XXVIII, elected not to do so without receiving permission from the OPA. As a result of extended and voluminous correspondence between plaintiff and the OPA, the Board of Directors of plaintiff, on January 10, 1944, decided to abide by an opinion of the OPA to the effect that such bonuses could not legally be paid. This decision not to pay such fishermen was made even though plaintiff's attorney was of the opinion that such payments could be made for the portion of the fish delivered to the plaintiff prior to the effective date of the regulation.

Plaintiff, in this case, contends that the action taken by plaintiff with reference to the 1943 bonus payments to the fishermen is irrelevant to the present inquiry. Even though I believe that the action taken by plaintiff concerning 1943, is relevant on the question of the intent of plaintiff to make the later payments, I am of the opinion that the tax liability for the years 1944 and 1945 may be determined without reference to plaintiff's conduct in connection with the 1943 bonuses.

The claimed obligation for 1944 does not appear in the "Report of Audit of December 31, 1944," nor in the "Report of Audit of December 31, 1945," prepared and submitted by plaintiff's accountants.

The minutes of plaintiff's Board of Directors for December 10, 1945, contain the following entry:

"Be it resolved that we pay to stockholders a stock dividend of Ten Dollars ($10) per share for the year 1945."

This resolution really meant a cash dividend and, in compliance therewith, plaintiff accrued and subsequently paid a cash dividend of $10,472.61 to its stockholders.

The annual audit for 1945 explains under "Accounts Payable Fishermen—$50,530.61" that:

"Of this amount $10,472.61 represents the company's liability to fishermen for a bonus distribution as provided in the By-Laws of the Company equal in amount to dividends declared to stockholders in 1945."

In explaining the similar entry under the same heading in the 1946 audit, the accountants stated:

"The allocation for the year 1945 has not been made to individual fishermen pending the findings on an O.P.A. opinion that such a payment was in violation of the then existing price ceilings. * * *

"A contingent liability to fishermen of this same nature exists for a 1944 dividend in the amount of $9,-380.60. No book record of this contingency has been made because of the decision of your management to *not* recognize such a liability until the Collector of Internal Revenue shall make a determination as to the allowability as cost of such a bonus for the year 1944."

Similar entries were made in plaintiff's 1947 report. The 1948 report stated:

"In addition, the Company is contingently liable for a 1944 bonus payment in the amount of $9,380.60. Recognition of the liability has been postponed awaiting a decision by the Collector of Internal Revenue as to allowability of the payment as a cost in 1944."

In a "To Whom It May Concern" letter dated August 23, 1950 (Defendant's pretrial exhibit 39), plaintiff's president and secretary swore:

"That the reason for non-payment of 1944–1945 bonus to fishermen to this date is because of uncertainty of allowance by the Revenue Department."

The letter continued that:

"Since decontrol * * * the Directors and Management did not care to take the responsibility of ordering payment or distribution until final clarification of the matter by the courts as regards O.P.A. and by the Collector of Internal Revenue."

The letter further stated that:

"If we have assurance that clearance will be given payments will be made on these 1944 and 1945 bonuses."

Some light is shed on plaintiff's attitude toward these matched bonuses by correspondence which is in evidence. Plaintiff's counsel, in a postscript to a letter to plaintiff's accountants of August 3, 1950 (Defendant's Exhibit 42) stated:

"On second thought, since I have just discussed this matter with Mr. Sorenson, the manager of the company, on account of the OPA we never did have anything in the minutes which provided for the payment of any bonus, or extra price, or whatever you choose to call it, for fish."

On August 18, 1950, plaintiff's counsel again wrote the accountants that:

"I had forgotten the history of this matter and wanted to go over this with Mr. Sorenson. He refreshed my memory regarding the bonus of 1944, and I recalled, after he mentioned it to me, that that was not paid on account of OPA's objections, but I understand that other companies did pay it and * * * your representative * * * said it was okay."

Mr. Anet, plaintiff's secretary, wrote the accountants on August 22, 1950, that:

"For the years 1943, 1944, and 1945 there was no bonus paid as the O.P.A. made a ruling that no additional bonus or prices can be paid fishermen."

He added that the auditors during the audit of 1945, informed plaintiff's officers that the bonuses could be paid and, with plaintiff's permission, set the amount for 1945 aside as a bonus.

During February 1953, a non-operating expense debit of $10,472.61 was entered in plaintiff's journal. The account-

ant testified that, at the completion of the audit in early 1946, it was decided that the matched bonus amounts should be accrued on the records, a refund claim for 1944 should be filed, and that the 1945 matched bonus should be claimed either as a cost of goods sold or as an expense of doing business."

If liability in fact accrued, I consider it immaterial whether the amount was entered in plaintiff's books or whether, if entered, it was entered correctly. Willoughby Camera Stores, Inc., v. Commissioner of Internal Revenue, 2 Cir., 1942, 125 F.2d 607. However, the mere entry of the claimed obligation in plaintiff's books does not establish that such an obligation accrued.

In 1947, after price regulations applicable to plaintiff had expired, plaintiff had substantial earnings and paid a total bonus to fishermen of $21,357.74. In 1948, plaintiff paid its fishermen a bonus matching a $10 per share dividend to its stockholders.

In 1949, plaintiff suffered heavy losses. Neither in 1947 nor in 1948, postwar years in which plaintiff had substantial earnings, did it attempt to discharge the so-called accrued obligation.

I have carefully examined the extensive documentary evidence and the transcript of the testimony in this action. My conclusion is, in neither year did plaintiff consider the matched bonus as an unqualified, undisputed, fixed and determined liability but, rather, that it has been treated as contingent due to fear of OPA prosecution and of uncertainty of allowance by the Internal Revenue Bureau. The testimony of the fishermen indicates that they acquiesced in plaintiff's obedience to OPA regulations. In neither year did plaintiff's books and records show a contemporary or even subsequent ultimate breakdown as to the division of the matched bonus.

On this showing plaintiff contends that it should be entitled to deduct these amounts from its income and add them to either the cost of raw fish bought or normal operating expenses. It urges that, in each year, an obligation to pay the matched bonus accrued and, in fact, that it was obligated and did obligate itself to make such payment.

Plaintiff ably urges that many of the tangential issues raised do not bar its claim.

It argues that, had it made the bonus payments, the amounts so paid would be deductible. This is probably correct. Anderson Oldsmobile, Inc., v. Hofferbert, D.C.D.Md.1952, 102 F.Supp. 902, affirmed, 4 Cir., 197 F.2d 504; Clark v. United States, D.C.N.D.Tex.1951, 107 F. Supp. 554; Commissioner of Internal Revenue v. Weisman, 1 Cir., 1952, 197 F. 2d 221; Herberger v. Commissioner, 9 T.C.M. 546 (1950), affirmed, 9 Cir., 195 F.2d 293, certiorari denied 344 U.S. 820, 73 S.Ct. 17, 97 L.Ed. 639.

Plaintiff contends that its by-laws required it to pay these matched bonuses to its fishermen. The interpretation of plaintiff's charter and by-laws is not here being litigated and need not be decided because, even if such by-laws gave the fishermen enforceable rights, such rights were abrogated by the Emergency Price Control Act of 1942 and the regulations issued pursuant thereto. Only that portion of contractual rights not in violation of the OPA survived enactment of the regulatory legislation. Fleming v. Rhodes, 1947, 331 U.S. 100, 67 S.Ct. 1140, 91 L.Ed. 1368; Brewing Corp. of America v. Cleveland Trust Co., 6 Cir., 1950, 185 F.2d 482.

Plaintiff urges that its moral obligation to pay such bonuses, combined with the competitive situation on the River, affords a legal basis for the payments of such bonuses for the years 1944 and 1945. While a mere moral obligation might not be deductible, Friedman v. Delaney, 1 Cir., 1948, 171 F.2d 269, certiorari denied 336 U.S. 936, 69 S.Ct. 746, 93 L.Ed. 1095, a non-enforceable obligation necessitated by commercial competitive reasons may be deductible under certain circumstances. Canton Cotton Mills v. United States, 1951, 94 F.Supp. 561, 119 Ct.Cl. 24.

Plaintiff admits that such payments might have subjected it to civil or criminal prosecution and penalties but claims that, if a cash basis taxpayer could deduct an illegal cash payment, an accrual basis taxpayer should be able to deduct an illegal accrued obligation.

It is not necessary to decide any of these contentions because, even though legality, enforceability, and proper accounting may not be requisite to the allowance for tax purposes of payments made or definitely accrued, it is incumbent that the taxpayer show either timely payment or accrual of an obligation.

The Supreme Court has recently defined the nature of an accrued obligation. In Dixie Pine Products Co. v. Commissioner, 1944, 320 U.S. 516, 64 S.Ct. 364, 365, 88 L.Ed. 420, the Court held that a taxpayer who had successfully challenged the levying of a state gasoline tax on cleaning solvent could not accrue the tax liability in the year of payment because,

> "It has never been questioned that a taxpayer who accounts on the accrual basis may, and should, deduct from gross income a liability which really accrues in the taxable year. It has long been held that, in order truly to reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer." 320 U.S. at page 519, 64 S.Ct. at page 365.

In Security Flour Mills Co. v. Commissioner, 1944, 321 U.S. 281, 64 S.Ct. 596, 88 L.Ed. 725, the taxpayer in 1935 withheld levies pursuant to the Agricultural Adjustment Act of 1933, 7 U.S.C.A. § 601 et seq., and instituted an action to enjoin collection of the tax, which was declared unconstitutional in January 1936. The Commissioner did not allow a deduction as an accrued obligation of the amounts of tax paid in escrow prior to such declaration of unconstitutionali-

ty. In affirming, the Court held, 321 U.S. at page 284, 64 S.Ct. at page 597, that:

> " * * * a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent, * * *."

And, 321 U.S. at page 286, 64 S.Ct. at page 599, in discussing principles of accrual, the Court held that:

> "This legal principle has often been stated and applied. The uniform result has been denial both to government and to taxpayer of the privilege of allocating income or outgo to a year other than the year of actual receipt or payment, or, applying the accrual basis, the year in which the right to receive, or the obligation to pay, has become final and definite in amount."

Plaintiff further contends that commercial necessity obligates it to pay the fishermen matched bonuses for the years 1944 and 1945. This may be true, but the question to be decided in this case is whether an obligation to pay these amounts accrued in 1944 and 1945. An obligation does not accrue merely because there is a desire on the part of a taxpayer to make a payment. A taxpayer must unconditionally obligate himself to make the payment.

The evidence reveals that, although plaintiff was always desirous of making the bonus payments to its fishermen, it did not regard itself as obligated to make such payments. In fact, it refused to obligate itself because it feared prosecution even if it did not make such payments but merely accrued a liability to be discharged in the future. Plaintiff's own books and records clearly establish that, in 1945, it considered the obligation, if any, to pay a matched bonus contingent upon permission from the OPA and allowance of a tax deduction.

On the basis of the testimony of plaintiff's officers and the other evidence introduced at the trial, I am convinced that plaintiff, during the years in question, did not obligate itself to make such payments because it knew that it was il-

legal for it to pay, or agree to pay to its fishermen, a bonus in addition to the OPA maximum price for raw fish. After the statute of limitations has run and plaintiff is no longer in danger of prosecution, it cannot translate a mere hope or desire into an obligation within the meaning of the Internal Revenue Code.

Because of the interest of so many persons, who are either stockholders or possible recipients of the funds sought to be recovered in these actions, I have included in this opinion much more detail than I normally would have done in a case of this kind.