ALBERT P. DeVITO and MARGARET DeVITO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
De Vito v. Commissioner
Docket No. 7216-77.
United States Tax Court
T.C. Memo 1979-377; 1979 Tax Ct. Memo LEXIS 145; 39 T.C.M. (CCH) 152; T.C.M. (RIA) 79377; September 17, 1979, Filed *145 P and other parties were sued for breach of employment contract and breach of fiduciary duties. In settlement of such action, P and his co-defendants agreed to transfer 30,000 shares of C stock. To acquire such stock, P and his co-defendants entered into separate contracts for the purchase of such stock from a third party, W. The number of shares to be purchased and transferred in settlement was allocated among P and his co-defendants pursuant to a separate agreement to which W was not a party. According to such agreement, P was to purchase and transfer 5,000 shares. Subsequent to the date such stock was transferred and the breach action dismissed, a dispute arose as to the purchase price of the 30,000 shares, and P paid the additional amount claimed by W for the entire 30,000 shares. Held:
(1) P is entitled to deduct the fair market value of his share of the stock, determined on the date such stock was transferred, as an ordinary and necessary business expense. (2) P is entitled to a short-term capital loss for the difference between his basis in 5,000 shares of the stock and the fair market value of such stock on the date transferred. Gerald B. Mullin,James J. Gatziolis, and Stuart A. Feldman, for the petitioners. *147 Virginia C. Schmid, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $14,615.46 in the petitioners' Federal income tax for 1973 and an addition to tax of $1,785.13 under section 6653(a) of the Internal Revenue Code of 1954. [1] The sole issue for decision is whether Mr. DeVito is entitled to deduct the amount which he paid in settlement of an action for breach of an employment contract to the extent that such amount exceeded the fair market value of the stock he transferred in settlement of such action. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Albert P. and Margaret DeVito, husband and wife, were residents of Glenview, Ill., at the time they filed their petition in this case. They filed their joint Federal income tax return for 1973, using the cash method of accounting, with the Internal Revenue Service, Kansas City, Mo. Mr. DeVito will sometimes be referred to as the petitioner. *148 Prior to July 3, 1969, the petitioner owned approximately one-third of the outstanding shares of Alcon Metal Products, Inc. (Alcon-old). The remaining two-thirds of such stock was owned equally by Charles DeVito, the petitioner's brother, and Premo Westol (Premo), the petitioner's brother-in-law. On July 3, 1969, Alcon-old entered into an agreement with Chromalloy American Corporation (Chromalloy), wherein Alcon-old agreed to transfer substantially all of its assets and certain liabilities to Conalco Metals, Inc. (Conalco), a wholly owned subsidiary of Chromalloy, in exchange for approximately 200,000 shares of Chromalloy common stock. Sometime between July 3, 1969 and July 15, 1969, the actual transfer of assets for stock was effectuated. After the transfer of its assets to Conalco in exchange for the Chromalloy shares, Alcon-old distributed such shares to the holders of Alcon-old common stock in complete liquidation. As a result of such liquidating distribution, the petitioner, Premo, and Charles DeVito each received approximately 60,000 shares of Chromalloy common stock, with a fourth party receiving the remaining 20,000 shares for having arranged the transaction. After *149 the liquidation of Alcon-old, Conalco changed its name to Alcon Metal Products, Inc. (Alcon). A condition of the Alcon-old/Chromalloy agreement was that the petitioner enter into an employment agreement with Conalco. On July 15, 1969, the petitioner entered into such an agreement, wherein he agreed that he would not interfere with the business of Conalco or its successors, would not engage in direct competition with it, and would not utilize any of the information he had gained as a shareholder and employee of Alcon-old for his personal gain. In October of 1969, the petitioner became a shareholder and an employee, the sales agent, of a newly organized corporation, Palmer Industries, Ltd. (Palmer), which manufactured products similar to those of Alcon. The other shareholders of Palmer were Marcine Wolverton, Palmer's president, and Louis Westol (Louis), Premo's son. In 1971, Alcon and Chromalloy (the plaintiffs) brought suit (the civil action) in the Circuit Court of Cook County, Ill., against the petitioner, Palmer, Mr. Wolverton, Louis, and other parties (the defendants) alleging breach of the covenant not to compete and breach of fiduciary duties. Proir to April 12, 1973, the *150 plaintiffs in such action indicated to the defendant's attorney, Gerald B. Mullin, that as part of any settlement they would require the delivery of 30,000 shares of Chromalloy common stock. Mr. Mullin discussed this demand with the petitioner, and they decided to explore the possibility of acquiring the 30,000 shares from Premo, as the petitioner did not desire to dispose of any of his Chromalloy shares at that time. Mr. Mullin thereafter approached Premo's attorney regarding the possibility of acquiring 30,000 shares of Chromalloy stock from Premo. Premo's attorney in turn discussed this proposal with Premo. On or about April 11, 1973, the petitioner and his co-defendants met with Mr. Mullin to discuss the proposed terms of settlement. The defendants discussed purchasing the 30,000 Chromalloy shares from Premo in a private, non-market transaction, which arrangement would enable them to avoid the payment of brokerage commissions and to delay the date of payment for such shares. Upon the tentative agreement of the defendants, either the petitioner or Mr. Mullin telephoned Premo regarding the possible purchase of 30,000 shares of his Chromalloy common stock. Premo assented to *151 this proposal, advising the caller that his selling price was $16 per share. On April 11, 12, and 13, 1973, the high, low, and closing prices of Chromalloy common stock, as traded on the New York Stock Exchange, were $16-1/8, $15-5/8, and $16-1/8, respectively. On April 12, 1973, the plaintiffs and the defendants in the civil action caused to be read into the record of that case an oral stipulation with respect to the terms of a settlement agreement tentatively agreed upon between the parties. It was stipulated therein that the defendants, or any one of them, should deliver to Chromalloy 30,000 shares of the common stock of Chromalloy. On April 27, 1973, Premo's attorney caused to be prepared promissory notes in favor of Premo for each of the parties to the purchase of the 30,000 Chromalloy shares. Information as to the amounts and the names of the debtors was obtained from Mr. Mullin, and the notes, after preparation, were given to him so that he could obtain the signatures of the purchasers. Such notes were prepared on the basis that, as represented by Mr. Mullin, the selling price was $15-1/2 per share. The notes called for two payments from each debtor: the first to *152 be due May 13, 1973, and the second to be due on June 27, 1973, both payments to be made with interest at the rate of 7 percent per annum after April 27, 1973. Premo's attorney did not discuss the selling price with him. On April 30, 1973, the petitioner, his co-defendants, and another party who had agreed to participate in the settlement because of his relationship to the parties-defendant, entered into a written agreement (the April 30 agreement) as to the acquisition and allocation of the 30,000 Chromalloy shares required to settle the civil action. The parties agreed that the petitioner, Louis, and two other parties would each purchase 5,000 shares and that Mr. Wolverton would purchase 10,000 shares. Each party was to acquire separately his shares from Premo at a price equal to the midpoint between the lowest bid and the highest asking price for such shares as traded on the New York Stock Exchange on May 1, 1973, and to transfer such shares to the plaintiffs in the civil action. It was further agreed that each party would share ratably and in proportion to his agreed settlement payment any liabilities, costs, expenses, or claims which might be asserted by virtue of the purchase *153 of the Chromalloy shares from Premo and the delivery of such shares to the plaintiffs. Each party also agreed that the benefits of such agreement would inure to them in ratio to their respective settlement payments and ratably between and among them. Premo was not a party to this agreement.The lowest bid, highest asking price, and midpoint between such prices, as such shares were traded on the New York Stock Exchange on May 1, 1973, were $14-7/8, $15-3/8, and $15-1/8, respectively. As collateral for the credit extended to the petitioner and the other parties, the petitioner gave Premo a security interest in 30,000 shares of Chromalloy common stock owned by him. The petitioner also gave Premo and his attorney, as well as Mr. Mullin, full trading authority over such shares for the period April 30, 1973 through July 31, 1973. On May 1, 1973, the parties to the civil action entered into a final settlement agreement, wherein the petitioner and his co-defendants agreed that on or before May 2, 1973, they would deliver to Chromalloy 30,000 shares of Chromalloy common stock as the defendants might allocate among themselves or any of them. It was further agreed that such shares *154 would be fully paid, nonassessable, and free of liens, encumbrances, and claims of any kind or nature whatsoever. On or about May 1, 1973, Premo's attorney delivered 30,000 shares of Chromalloy stock to the defendants, who on May 1, 1973, tendered such shares to Chromalloy. In accord with the settlement agreement, the civil action was dismissed with prejudice on such date. On or about May 1, 1973, the defendants executed the promissory notes, which were delivered by Mr. Mullin to Premo's attorney. On May 2 or 3, 1973, Mr. Mullin telephoned Premo's attorney to advise him that the notes had been prepared in the wrong amount, and that the price per share should have been $15-1/8 rather than $15-1/2.Premo's attorney made note of the $15-1/8 price in his records. However, he did not discuss the price with Premo. On or about May 13, 1973, Premo's attorney collected the first installment due from each purchaser, except the petitioner.On or about June 27, 1973, he collected the second installment from the purchasers who had made payment, plus interest at the rate of 7 percent per annum. These payments were based on a purchase price of $15-1/8 per share. On June 26, 1973, the petitioner *155 paid $75,625, which represented a purchase price of $15-1/8 per share. On or about August 3, 1973, Premo's attorney transmitted to him an accounting of these transactions. Such accounting was the first written comunication received by Premo which indicated a price of $15-1/8 per share, or any other price. Upon receipt of such accounting, Premo advised his attorney that a mistake had been made, that his selling price had been $16 per share, and that the amount credited to his account was deficient. Sometime between August 3 and September 18, 1973, Premo's attorney discussed his client's contention with Mr. Mullin, who in turn brought it to the attention of the petitioner. Neither the petitioner nor Mr. Mullin contacted any of the other parties to the April 30 agreement regarding Premo's contention, nor did Premo threaten to sue the petitioner with respect to the deficiency. On September 18, 1973, the petitioner issued his check to Premo in the amount of $26,622.15, and such check was delivered to Premo's attorney. Such payment represented the additional $7/8 per share claimed by Premo as to the entire 30,000 shares of Chromalloy, $26,250.00, plus interest on the petitioner's *156 June 26, 1973 payment in the amount of $372.15. The agent who audited the petitioners' 1973 income tax return was advised by the petitioner that the September 18, 1973 payment was made to avoid a family argument. During the early part of 1973, while the civil action was pending, the petitioner, Mr. Wolverton, and the remaining shareholders of Palmer were negotiating to sell Palmer.At the same time, the petitioner and Louis were negotiating to sell their wholly owned corporation, L.W. Sales Corporation (L.W.), which was the exclusive Chicago-area sales agent for products manufactured by Palmer. On April 30, 1973, a reorganization agreement (reorganization agreement) was entered into between Palmer and its shareholders, L.W. and its shareholders, and Bally Manufacturing Company (Bally) for the acquisition of Palmer and L.W. by Bally. In such agreement, the shareholders of Palmer and L.W. represented and warranted to Bally that as of the closing date stated therein, May 25, 1973, there would be no litigation pending against or affecting Palmer or L.W. or their respective businesses. The agreement also required, as a condition precedent to Bally's performance, that no suit, action, *157 or other proceeding was threatened or pending before any court which would materially and adversely affect the value of Palmer or L.W. or their respective businesses. On May 25, 1973, the reorganization agreement was carried out. Both prior to and subsequent to the close of the reorganization agreement, Mr. Wolverton was president of Palmer and Louis was president of L.W. On or about July 27, 1973, in accordance with the reorganization agreement, Louis resigned as president of L.W. and Mr. Wolverton became its president. During the times relevant herein, Mr. Wolverton remained in control of both Palmer and L.W.
On April 30, 1973, in accordance with certain provisions of the reorganization agreement, the petitioner and L.W. entered into a written employment agreement. Under the terms of such agreement, the petitioner was employed as a salesman and agreed to sell products manufactured by Palmer only as an employee of L.W.; he also agreed not to sell, while an employee of L.W., products which were directly competitive with those of Palmer. The employment agreement was for a period of 5 years and contained covenants not to compete to extend for 2 years after any termination of *158 such agreement. The petitioner's income was substantially dependent upon territorial sales of Palmer products. On their 1973 Federal income tax return, the petititoners deducted $102,247.15, the June 26 and September 18, 1973 payments made by the petitioner to Premo, as a miscellaneous itemized deduction. In his notice of deficiency, the Commissioner allowed a deduction for the June 26 payment, $75,625.00, and disallowed the September 18 payment, $26,622.15, in its entirety. Subsequently, the Commissioner allowed $372.15 of the September 18 payment as an interest expense paid in 1973. OPINION The main issue for decision is whether the petitioners are entitled to a deduction with respect to the additional $7/8 per share paid by Mr. DeVito to Premo on September 18, 1973. The petitioners contend that the September 18 payment is an additional payment made to settle the civil action and is, therefore, deductible as an ordinary and necessary business expense. The petitioners make two alternative contentions: first, they argue that the September 18 payment was made to protect Mr. DeVito's employment with L.W. and is, therefore, allowable as an ordinary and necessary business expense; *159 second, they argue that, at least, they are entitled to deduct as a capital loss the difference between Mr. DeVito's basis in the stock, $101,875, and its fair market value, $75,625, when transferred in settlement of the civil action. The Commissioner concedes that the petitioners are entitled to an ordinary and necessary business expense deduction for the fair market value of the stock transferred by Mr. DeVito in settlement of the civil action. The Commissioner maintains that thr September 18 payment was voluntary and not deductible; in the alternative, he argues that, at most, the petitioners are entitled to a short-term capital loss measured by the portion of the September 18 payment allocable to 5,000 shares, since only that portion of such payment is properly allocable to the shares transferred by Mr. DeVito. Section 162 allows a deduction for all the ordinary and necessary expenses paid or incurred in carrying on a trade or business. The determination of whether the payment of a judgment is an ordinary and necessary business expense is made by the application of the "origin of the Claim" test. See United States v. Hilton Hotels Corp.,397 U.S. 580 (1970); *160 Woodward v. Commissioner,397 U.S. 572 (1970); United States v. Gilmore,372 U.S. 39 (1963). The determination is not based on the consequences to the taxpayer of not settling the litigation, nor on the taxpayer's primary purpose in entering into the settlement. See Anchor Coupling Co. v. United States,427 F. 2d 429, 431 (7th Cir. 1970), cert. denied 401 U.S. 908 (1971). Thus, the proper characterization of the September 18 payment turns on the origin of Premo's claim against the petitioner. At the time of the settlement negotiations, the petitioner owned at least 30,000 shares of Chromalloy common stock. If he had desired to do so, he could have used a portion of such stock to satisfy his share of the agreed litigation settlement. However, he chose to purchase from Premo, as did his co-defendants, his allocable share of the stock required for the settlement of the litigation. Premo was not a party to the civil action; nor was he a party to the April 30 agreement wherein the petitioner and his co-defendants agreed among themselves as to the allocation of the stock required for the settlement. Thus, the origin of Premo's *161 claim against the petitioner was in the purchase and sale of such stock. Such transaction was separate and distinct from that of the litigation settlement, and its tax consequences must be separately determined. Cf. Montana Power Co. v. United States,145 Ct. Cl. 611, 171 F. Supp. 943 (1959).
At the time of the September 18 payment, the petitioner was employed by L.W. under a written employment contract. His income was largely dependent upon territorial sales of products manufactured by Palmer. The president of L.W. was Mr. Wolverton, who was the largest contributor to the litigation settlement. On these facts, the petitioners base their alternative position that the September 18 payment was made to preserve harmony with Mr. Wolverton and thereby protect Mr. DeVito's employment with L.W. Accordingly, they contend that such payment is an ordinary and necessary business expense. We disagree. The question of whether an expenditure is an ordinary and necessary business expense is essentially one of fact. Commissioner v. Heininger,320 U.S. 467 (1943); Schulz v. Commissioner,16 T.C. 401 (1951). The petitioners have the burden *162 of proving that such expenditure was both ordinary and necessary. Welch v. Helvering, 290 U.S. 111, 115 (1933). While necessary does not mean indispensable, a taxpayer must show affirmatively, not only that there are business ends to be served, but also an intention to serve those business ends by means of the expenditure. Interstate Drop Forge Co. v. Commissioner,326 F. 2d 743 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. The petitioner told the agent who audited his 1973 return that the September 18 payment was made to avoid a "family argument." Also, the petitioners not only seek a deduction for Mr. Wolverton's retable share of the settlement agreement, but for that of other parties as well. Such circumstances are not indicative of a business purpose. Clearly, it was not an ordinary business expense. As the Court stated in Welch v. Helvering, supra at 114: Men do at times pay the debts of others without legal obligation or the lighter obligation imposed by the usages of trade or by neighborly amenities, but they do not do so ordinarily * * * we should have to say that payment in such circumstances, instead *163 of being ordinary is in a high degree extraordinary. * * * An expense which is necessary but not ordinary is not deductible. Welch v. Helvering, supra.Thus, it appears that the September 18 payment was made in satisfaction of a personal or moral obligation of the petitioner. See Friedman v. Delaney, 171 F. 2d 269 (1st Cir. 1948), cert. denied 336 U.S. 936 (1949). At trial and in their petition, the petitioners set forth two additional theories for the allowance of a deduction as an ordinary and necessary business expense for the entire amount of the September 18 payment made by Mr. DeVito. They contended that the September 18 payment was made to protect the 30,000 shares of Chromalloy stock which Mr. DeVito pledged as security for the performance of the obligations to pay for the stock purchased from Premo; they also argued that such payment was made to facilitate the Palmer-L. W. merger. However, the petitioners have abandoned such arguments on brief, and thus, we need not comment on them. In support of their claim for a larger deduction than that allowed by the Commissioner, the petitioners maintain that on April 12, 1973, Mr. *164 DeVito and the other co-defendants became obligated to transfer the Chromalloy stock in settlement of the litigation and that, therefore, the amount of the deduction is fixed by the fair market value of the stock on that date. They also assert that, in any event, the fair market value of the stock should not be based simply on the mean between the high and low selling prices of the stock on the stock exchange. On this record, it is not clear whether Mr. DeVito and the other co-defendants became legally obligated to transfer the stock in settlement of the litigation on April 12, 1973, when they read into the record the "tentative" agreement or whether they did not become legally obligated until the following May 1, when they entered into the final settlement agreement. However, we need not resolve that uncertainty, for it is clear that, in this case, the date of payment is the critical date. The petitioner is a cash method taxpayer, and for such a taxpayer, the amount of the deduction is based on the circumstances existing on the date payment of a judgment or settlement is actually made. See Insurance Finance Corp. v. Commissioner, 84 F. 2d 382 (3d Cir. 1936), *165 affg. a Memorandum Opinion of this Court.Where the payment of the judgment or settlement is made by the transfer of property, rather than in cash, the amount of the deduction is the fair market value of such property on the date of transfer. See Bankers Trust Co. v. United States, 207 Ct. Cl. 422, 518 F. 2d 1210 (1975), cert. denied 424 U.S. 966 (1976); Montana Power Co. v. United States, supra.The record is clear that the date the Chromalloy stock was tendered and accepted in settlement of the vicil action was May 1, 1973. Thus, the petitioners' deduction with respect to the litigation settlement is limited to the fair market value of the shares tendered by Mr. DeVito on such date.
Fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs. There is no universally infallible index of fair market value. All valuation is necessarily an approximation. *166 However, where the property to be valued consists of securities traded on a stock exchange, the general rule is that the average exchange price quoted on the valuation date furnishes the most accurate, as well as the most readily ascertainable, measure of fair market value. United States v. Cartwright, supra.Although there are exceptions to such general rule (see LeVant v. Commissioner, 376 F. 2d 434 (7th Cir. 1967), revg. on another issue 45 T.C. 185 (1965); Richardson v. Commissioner, 151 F. 2d 102 (2d Cir. 1945), affg. a Memorandum Opinion of this Court, cert. denied 326 U.S. 796 (1946)), the petitioners have not shown any reason for applying any exception in this case. There is no evidence as to the state of the market for Chromalloy common stock, or evidence indicating that the purchase of such stock by the petitioner and his co-defendants would have affected the exchange price for such stock. In the absence of such evidence, we find that the mean between the high and low exchange prices of such stock on May 1, 1973, or $15-1/8 per share, was the fair market value of such stock. We have also *167 rejected the petitioners' argument that the fair market value of the stock should be increased by the brokerage commissions that the petitioner would have paid if such stock had been purchased in other than a private transaction. In fact, Mr. DeVito and the other co-defendants paid no such commissions to acquire the stock. Moreover, it is well settled that such costs are not included in determining the fair market Value of property. United States v. Cartwright, supra at 553; see Scott v. Henricksen, an unreported case ( W.D. Wash. 1941, 29 A.F.T.R. 1465, 41-2U.S.T.C. par. 10,098). Accordingly, the petitioner's deduction with respect to the shares transferred in settlement of the civil action is $75,625, the amount allowed by the Commissioner. Having reached that conclusion, we now come to the question of whether the petitioners are entitled to deduct any capital loss by reason of the transfer of the Chromally stock in the settlement of the civil action. If a capital asset is transferred in consideration for the extinguishment of a liability of the transferor in an amount less than the cost basis to the transferor of the asset transferred, *168 the resulting loss to the transferor is a capital loss. Rogers v. Commissioner, 103 F. 2d 79 (9th Cir. 1939), affg. 37 B.T.A. 897 (1938), cert. denied 308 U.S. 580 (1939). Clearly, the 5,000 shares of Chromalloy stock transferred by Mr. DeVito were a capital asset in his hands. Sec. 1221. Also, on May 1, 1973, his share of the litigation settlement was a fixed liability. Had the parties to the civil action agreed on a figure to be paid in cash, and, to raise the settlement amount, Mr. DeVito had sold the 5,000 shares of Chromalloy which he had purchased from Premo, he could deduct any excess basis as a capital loss. Here, instead of selling such stock and paying cash to the plaintiffs, Mr. DeVito transferred such stock directly to the plaintiffs in the civil action. In either case, the transaction constitutes a sale or exchange of a capital asset. See Montana Power Co. v. United States, supra; Peninsula Properties Co., Ltd. v. Commissioner, 47 B.T.A. 84 (1942). Thus, if Mr. DeVito's basis in the 5,000 shares transferred by him exceeded the fair market value of such stock, he is entitled to treat the *169 excess as a capital loss. The evidence is somewhat unclear as to whether there was any legal obligation on Mr. DeVito to pay Premo the additional $7/8 per share for any of the Chromalloy stock acquired by him and his co-defendants. He contends that Premo had a claim against him for the entire additional payment and that he made such payment for sound business reasons. Accordingly, he argues that he should be allowed to add the entire amount to the basis of the 5,000 shares purchased by him from Premo and transferred in the settlement of the civil action. Under the April 30 agreement, Mr. DeVito and his co-defendants agreed upon the allocation of the stock to be purchased and transferred in the settlement. They also agreed to share in the same proportion any liabilities or other expenses incurred in purchasing such stock. Hence, Mr. DeVito became liable to purchase 5,000 shares of Chromalloy stock and became responsible for any expenses incurred in connection with such purchase. However, there had been no showing that he was liable to make the entire payment for all the 30,000 shares, and the April 30 agreement gave him an express right to seek reimbursement from the other co-defendants *170 for their shares of the additional expenses which he paid for them. In view of that express claim against the other co-defendants, he may not treat the amount of such claims as a part of his basis in acquiring the 5,000 shares transferred by him in the settlement. Heidt v. Commissioner, 274 F. 2d 25 (7th Cir. 1959), affg. a Memorandum Opinion of this Court; Whitney v. Commissioner, 13 T.C. 897 (1949). The petitioners have not argued that the claims against the other co-defendants became worthless in 1973, and there is no evidence showing that they made any attempts to collect such claims or that the claims became worthless in that year. Sec. 166; H. D. Lee Mercantile Co. v. Commissioner, 79 F. 2d 391 (10th Cir. 1935), affg. a Memorandum Opinion of this Court. Though there may be some doubt as to whether Premo had a legally enforceable claim for any additional payment from Mr. DeVito and the other co-defendants, we are satisfied that he had a colorable claim against them and that Mr. DeVito was exercising sound business judgment in paying such claim without any further dispute. See C. Ludwig Baumann & Co. v. Marcelle, 203 F.2d 459 (2d Cir. 1953); *171 Old Town Corp. v. Commissioner, 37 T.C. 845 (1962).Accordingly, Mr. DeVito may treat as a part of his basis in the 5,000 shares purchased by him the amount of $4,375, the portion of the September 18 payment allocable to such shares. As a result, he sustained a capital loss in that amount, and since he held the stock for less than 6 months, it is a short-term capital loss. Sec. 1222(2). The second issue for decision is whether any part of the underpayment of tax for 1973 was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). The petitioners have the burden of proof on this issue. Bixby v. Commissioner, 58 T.C. 757 (1972); Inter-American Life Insurance Co. v. Commissioner, 56 T.C. 497 (1971), affd. per curiam 469 F. 2d 697 (9th Cir. 1972); Rosano v. Commissioner, 46 T.C. 681 (1966). They have offered no evidence on this issue, and accordingly, we must sustain the Commissioner's determination as to such addition to tax. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.↩