**Max LUTZ and Ruth Lutz, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 17960.

United States Court of Appeals
Fifth Circuit.

Sept. 9, 1960.

C. B. Gregory, Elwood Cluck, San Antonio, Tex., for petitioners.

Meyer Rothwacks, Thomas R. Scovel, Grant W. Wiprud, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Charles Owen Johnson, Sp. Atty., Herman T. Reiling, Acting Chief Counsel, I.R.S., Washington, D. C., for respondent.

Before RIVES, Chief Judge, and CAMERON and WISDOM, Circuit Judges.

CAMERON, Circuit Judge.

The issue upon which this appeal will be decided is whether the Tax Court erred in denying, upon the ground that the losses were incurred, not by taxpayer

but by three controlled corporations, certain deductions from gross income made by petitioner [1] Max Lutz in his income tax returns for the years 1948 and 1949. The deductions were made in petitioner's income tax returns (made on the accrual basis) under § 23(a) (1) (A) of the Internal Revenue Code of 1939, 26 U.S.C., 1952 Ed., § 23:

> "In computing net income there shall be allowed as deductions: * * Trade or business expenses. * * * All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *."

Petitioner urges that, under the undisputed evidence, he was entitled to claim as proper deductions from his gross income the amounts he paid and debts he assumed with respect to creditors of said three corporations. Respondent claims that the corporations carried on, during the tax years involved, the farming operations in the States of Idaho and Oregon which had formerly been carried on by petitioner; and that the payments made by taxpayer were not, under said statute, deductible as ordinary and necessary expenses of his personal business operations made, as claimed by him, in order to protect and preserve his individual credit and standing in the industry in which he was engaged. Most of the Commissioner's argument is devoted to an effort to show that these business operations were in fact conducted during those years by the corporations involved and not by petitioner individually. A great part of petitioner's argument addresses itself to a refutation of this argument.

Since we think that the Tax Court decision cannot be supported even assuming that the Idaho and Oregon businesses were so conducted by the corporations, we shall not deal at any length with that phase of the argument. We omit, therefore, the extensive analysis of this question made in the opinion of the Tax Court, and we quote and adopt the portion of the Tax Court's findings which relate to the question upon which our decision will be rested.[2] In our opinion

---

1. Returns were made by Max Lutz and Ruth Lutz, his wife, but the former will be referred to throughout this opinion as the taxpayer or petitioner.

2. "The questions presented are:
"Whether petitioners sustained business losses or expenses of $274,346 and $73,396.91 in 1948 and 1949, respectively; * * *

"Findings of Fact.
"Certain facts were stipulated and are hereby found accordingly. * * *

"In 1931, petitioner became a resident of the Rio Grande Valley of Texas, sometimes hereafter called the Valley. From 1931 to 1942 petitioner engaged in the business of buying and selling perishable agricultural produce as a broker. In 1942, petitioner commenced growing produce as well as buying produce for sale to his brokerage customers. Petitioner produced crops on land which he owned or leased and contracted with Valley farmers for crops produced on their lands. He maintained an office in McAllen, Texas. Petitioner had a strong credit position which was necessary to operate his business.

"The farming operations consisted of planting and cultivating, and at maturity, harvesting and delivering the crop to the processing and packing sheds. All crops were processed before they were sold to commodity brokers. The processing of crops consisted of transporting crops from the field to sheds where they were washed, graded, iced and packed into cartons or other containers to which was affixed a trade name or label indicating petitioner as the grower, processor and shipper. The crops were then placed on common carriers for shipment to commodity brokers throughout the United States.

"Petitioner's operations in the Valley continued from 1942 through the trial of this case in 1958. From 1943 through 1949, those operations which were not carried on by him as an individual were carried on as joint ventures or partnerships. In the joint ventures petitioner agreed to divide profits according to predetermined percentages and to bear the losses.

"Petitioner, in the conduct of his farming operations, made initial outlays of funds long before he realized any return on the crops. He was paid when the crops were finally delivered and accepted.

"Petitioner could not lawfully engage in the business of buying and selling per-

these facts, supplemented by undisputed evidence we shall advert to, require, under the authorities submitted to us, a finding in favor of petitioner.

Petitioner relies in his argument before us chiefly upon our decision in A. Harris & Co. v. Lucas, 5 Cir., 1931, 48 F.2d 187,[3] and L. Heller & Son, Inc. v. Commissioner of Internal Revenue, Tax Court of United States, 1949, 12 T.C. 1109, and cases citing them; while the Commissioner places his reliance mainly upon Welch v. Helvering, Commissioner, 1933, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed.

212; Aqualane Shores, Inc. v. Commissioner, 5 Cir., 1959, 269 F.2d 116; and Camp Wolters Enterprises v. Commissioner, 5 Cir., 1956, 230 F.2d 555.

In Harris & Co. v. Lucas, Commissioner, the petitioner, which operated a store in Dallas, Texas, effected a compromise with its creditors other than the banks (thereby avoiding bankruptcy) under which fifty percent was accepted by its creditors in full settlement of their claims against it. For the year of the compromise settlement Harris returned the amount relinquished by its creditors

ishable agricultural produce without a license as a produce buyer and shipper issued by the United States Department of Agriculture under the provisions of the Perishable Agricultural Commodities Act, hereafter called the P.A.C.A. Petitioner obtained license number 78809 and held it during the years involved.

"In 1941 or 1942, petitioner commenced operations in Emmett and Nampa, Idaho, and Nyssa, Oregon, similar to those in the Valley. These consisted of farming, processing, packing, shipping and selling perishable agricultural produce. A separate set of books was kept for the farming operations at Nyssa, Oregon; the farming operations at Emmett, Idaho; the farming operations at Nampa, Idaho; the packing plant at Nampa, Idaho. All phases of the business in Idaho and Oregon prior to 1948 were carried on in the name of petitioner. Produce was packed and shipped under his name and brand labels, and many of the drafts were drawn on buyers by petitioner personally. * * *

"During 1947, petition's [sic] petitioner's employees discussed with him the possibility of incorporating the Idaho and Oregon operations in order that they might acquire an interest in the business. * * *

"During the period petitioner carried on individual operations in Idaho and Oregon, he used certain trademarks, some of which were 'Max Pack,' 'Ida Pak,' 'Western Gem,' 'Sel-Mor' and 'Real West.' Petitioner was granted the 'Mac Pack' trademark in 1945. In 1948, petitioner filed applications with the United States Patent Office for the 'Ida Pak' trademark and 'Western Gem' trademark. The 'Ida Pak' trademark was granted petitioner in 1950 and the 'Western Gem' trademark was granted petitioner in 1949. Petitioner permitted Produce and

L. & H. to use his trademarks and labels in 1948 and 1949. After the labels bearing petitioner's individual name were exhausted, Produce obtained new labels with petitioner's trademarks imprinted thereon indicating the shipper was Produce. * * *

"Petitioner's books indicate that he paid to creditors of Lutz Produce Co., L. & H. Produce Co., and Lutz Farms Co., $70,530.51 in 1948 and $85,907.87 in 1949, and that he advanced to the same companies $107,895.48 in 1948 and $23,677.80 in 1949 leaving unpaid liabilities of $15,608.43 for 1948 and $103,878.93 for 1949. * * *

"The amount in dispute for 1948 is stipulated to be $274,346. * * *"

3. Referred to or cited with approval in a large number of cases including Burton-Sutton Oil Co. v. Commissioner of Int. Rev., 5 Cir., 1945, 150 F.2d 621, 160 A. L.R. 961, certiorari denied 326 U.S. 755, 66 S.Ct. 93, 90 L.Ed. 453; Bliss v. Commissioner of Int.Rev., 5 Cir., 1932, 57 F.2d 984; Welch v. Helvering, infra; Van Iderstine Co. v. Commissioner of Int. Rev., 2 Cir., 1958, 261 F.2d 211, 213; United States v. E. L. Bruce Co., Inc., 6 Cir., 1950, 180 F.2d 846; Patrick McGuirl, Inc. v. Commissioner of Int. Rev., 2 Cir., 1935, 74 F.2d 729; Friedman v. Delany, Collector, 1 Cir., 1948, 171 F.2d 269; Commissioner of Internal Revenue v. Textile Mills Securities Corp., 3 Cir., 1940, 117 F.2d 62; Commissioner of Internal Revenue v. Chicago Dock & Canal Co., (Chicago Dock & Canal Co. v. Comm. of Int. Rev.), 7 Cir., 1936, 84 F. 2d 288; Farmers & Merchants Bank of Cattlesburg, Ky. v. Commissioner of Int. Rev., 6 Cir., 1932, 59 F.2d 912, 913; and L. Heller & Son, Inc. v. Commissioner, infra.

as profits and paid taxes accordingly. Some years later, finding its credit practically destroyed and in order to reestablish it, Harris agreed to pay its creditors the full amount due them. The Commissioner disallowed the amounts so paid and assessed additional taxes, which action the Board of Tax Appeals affirmed, 16 B.T.A. 705. Quoting the words of the statute set forth near the beginning of this opinion, we reversed, stating in part:

[48 F.2d at Pages 188, 189] "It is evident that the words 'ordinary' and 'necessary' in the statute are not used conjunctively, and are not to be construed as requiring that an expense of a business to be deductible must be both ordinary and necessary in a narrow, technical sense. On the contrary, it is clear that Congress intended the statute to be broadly construed to facilitate business generally, so that any necessary expense, not actually a capital investment, incurred in good faith in a particular business, is to be considered an ordinary expense of that business. This in effect is the construction given the statute by the Treasury Department and the courts * * *.

"Of course, each case depends for decision upon its own facts, and it would be impossible to formulate a uniform rule to govern all cases. * * * It [taxpayer] was under no legal obligation to make the payments, and they were made entirely to promote the business by restoring its credit with the wholesalers from whom it purchased goods.

"It is argued, however, on behalf of the respondent, that the expenditures were in the nature of the purchase of good will, the benefit of which would accrue over a period of years and that good will is a capital asset. * * * Good will consists

largely of a reputation for competence, honesty, and fair dealing, but its value is in attracting customers and not in securing credit. * * *.

" * * * The payments may be classed as advertising expenditures as they secured credit not only from those to whom made but from the trade in general. They might be classed as bonuses paid to secure credit, * * *. But no matter how classed, it is certain that they were necessary to preserve and continue the business * * *."

The facts of Heller & Son v. Commissioner, supra, are a little closer to those presented here than are the facts of Harris. Heller petitioned for a redetermination of a deficiency assessment in excess profits tax. The deduction sought to be allowed were amounts paid by Heller & Son to indemnify creditors of a subsidiary corporation, wholly owned by the taxpayer, which had undergone reorganization under § 77, sub. b of the Bankruptcy Act, 11 U.S.C.A., § 205, sub. b.[4] Heller & Son returned the payments as a business expense and the Commissioner disallowed the claimed deduction on the same grounds he gave in disallowing the deductions involved here—that the payment constituted a capital expenditure. Upon petition for redetermination the Tax Court concluded that the standing of Heller & Son, Inc. in the business community and its credit rating in the jewelry business characterized the payments as a legitimate means of protecting and promoting its business and as a natural and reasonable cost of its operation, and that they were therefore deductible as ordinary and necessary business expense. Harris & Co. v. Lucas, supra, was cited as the main support of this holding. The opinion quoted part of what we have quoted from Harris & Co., supra. The Commissioner acquiesced in this decision of the Tax Court.

4. The reorganization plan provided that the subsidiary should pay forty-five per cent of the principal amount of the claims of unsecured creditors. Subsequently the president of Heller & Sons orally promised that said corporation would pay the remaining balance of fifty-five per cent of said claims.

The Commissioner, in his argument before us here, leans most heavily upon the Supreme Court's decision in Welch v. Helvering, supra. We think the facts there involved clearly differentiate that case from this one; in fact, we find more in the Welch case to support petitioner's argument than that of respondent.

The Supreme Court there affirmed the action of the Commissioner, sustained by the Board of Tax Appeals,[5] and the Court of Appeals for the Eighth Circuit[6] in holding that *there was no proof* that the payments made by Welch, former secretary of a bankrupt corporation, in payment of some of its debts, were ordinary and necessary business expenses and were not, as held by the Commissioner, "in the nature of capital expenditures, an outlay for the development of reputation and good will." The Supreme Court recognized that the point of distinction between the two was a close one and that the solution of such questions varied *from case to case according to the facts involved.*

> [290 U.S. 114–116, 54 S.Ct. 9] "Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. * * *
>
> * * * * * *
>
> "Many cases in the federal courts deal with phases of the problem presented in the case at bar. To attempt to harmonize them would be a futile task. They involve the appreciation of particular situations, at times with border-line conclusions. Typical illustrations are cited in the margin." [7]

Indeed, the quotation made in respondent's brief from Welch v. Helvering tends to differentiate the facts upon which the Supreme Court based its holding in that case from those facing us here.[8] It is clear from the stipulations in this record, the findings of the Tax Court, and the undisputed testimony of Lutz, which we are bound to accept as true where, as here, the testimony is not contradicted by any other proof in the record Foram, et. al. v. Commissioner, 5 Cir., 1948, 165 F.2d 705,[9] that this case is not ruled by Welch v. Helvering. Certainly Lutz was not paying out these large sums of money without legal obligation, or to satisfy neighborly amenities, or to heighten his reputation for generosity and opulence.

5. 25 B.T.A. 117.

6. 63 F.2d 976.

7. One of the illustrations cited by the Supreme Court in said note is Harris v. Lucas, supra, which is listed as a case involving "ordinary expenses."

8. "Men do at times pay the debts of others without legal obligation or the lighter obligation imposed by the usages of trade or by neighborly amenities, but they do not do so ordinarily, not even though the result might be to heighten their reputation for generosity and opulence. Indeed, if language is to be read in its natural and common meaning * * * we should have to say that payment in such circumstances, instead of being ordinary is in a high degree extraordinary." 290 U.S. 114, 54 S.Ct. 9. We do not find our cases of Aqualane Shores, Inc. v. Commissioner and Camp Wolters v. Commissioner sufficiently applicable to the facts before us to merit detailed discussion. The author of this opinion sat in both of those cases and concurred in them. They involved other sections of the Internal Revenue Statutes (26 U.S.C.A. §§ 112(b) (5), (c) (1) and 113 (a) (8) (A)) and we do not find them relevant to the questions before us here.

9. To the same effect see Chesapeake & Ohio Ry. Co. v. Martin, 1930, 283 U.S. 209, 51 S.Ct. 453, 75 L.Ed. 983; Pence v. United States, 1942, 316 U.S. 332, 62 S.Ct. 1080, 86 L.Ed. 1510; Georgia-Pacific Corp. v. United States, 5 Cir., 1959, 264 F.2d 161; Benton v. Blair, 5 Cir., 1955, 228 F.2d 55; Ross v. Commissioner of Internal Revenue, 5 Cir., 1955, 227 F.2d 265; Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353; National Labor Relations Board v. Ray Smith Transport Co., 5 Cir., 1951, 193 F.2d 142; and J. H. Robinson Truck Lines, Inc. v. Commissioner of Internal Revenue, 5 Cir., 1950, 183 F.2d 739.

Lutz was a citizen of Texas and had, for seventeen years, been conducting a highly successful business of buying and selling perishable agricultural produce as a dealer or broker when the transactions leading to this tax dispute arose; and, for six years, had been a grower of such produce. And he had a strong credit position, which was essential to the operation of his business. For six years he had engaged as an individual in the farming, processing, shipping and selling of perishable agricultural produce in the States of Idaho and Oregon in connection with which he had separate employees and kept separate sets of books. The produce originating from Texas, Idaho and Oregon was packed and shipped under his name and brand labels.

During 1947 some of the trusted employees of petitioner in Idaho and Oregon took up with him the purchase of interests in those businesses and the parties agreed that corporations should be formed to facilitate such purchases. This arrangement was planned solely at the instigation of the employees and for their benefit. There is no proof in the record that petitioner ever made any plan or took any step with the purpose of shielding himself from personal liability by doing business in Idaho and Oregon under corporate structures. There was clear proof that many activities were engaged in by the three corporations in connection with the carrying on of the business in those two states,[10] but we do not discuss it because we are assuming for the purpose of this opinion that the businesses were conducted by the three corporations. But the stipulation, the findings of fact by the Tax Court and the undisputed evidence of the petitioner showed that the deductions here involved were made up of items which Lutz was, in the natural course of things, bound to make good in order to continue in the business he had so successfully operated through the years. The proof, which we repeat by way of summary, showed without dispute that:

Petitioner had operated a successful business for seventeen years before the corporations were thought of or formed, during which time all of the items of expense in Idaho and Oregon were deductible from his overall operations in the three states. By and large, the people who bought the produce coming out of Idaho and Oregon during the two years were the same people who were buying the Texas produce and who had been customers of petitioner of long standing. In the main, the business done in Idaho and Oregon during the two tax years was bottomed upon the credit standing of petitioner. The conveyances of the real and personal property used in these operations through the years, although executed by petitioner and placed in the hands of the long-time employees who were desirous of buying stock in the three new corporations, were withheld from recordation upon explicit instructions from petitioner. The corporations, therefore, had little property to which they held record title, which might serve as the basis for credit independent of that derived from petitioner's connection with them and his participation in their management as in former years and his backing, with his own credit, a large portion of the transactions which constituted the bases of the expense deductions here involved.

The Court of the Second Circuit [11] cited both Harris and Heller, supra, in reversing a decision of the Tax Court in which it had held the taxpayer liable for taxes on a payment of $25,000 which had been made to a chain store with the expectation and hope that said store would give taxpayer preference in the disposal of its fats and similar products.

10. There is much counntervailing proof and it would be difficult to resolve the uncertainty attending the question whether there was sufficient substantial evidence to sustain the finding of the Tax Court that the Commissioner was substantially supported in his holding that the businesses in those two states are conducted by the corporation.

11. In Van Iderstine Co. v. Commissioner, supra.

The Tax Court had held that the payments were made to protect and promote the taxpayer's business and were not, under Harris, Heller and other cases, entitled to be classified as deductible business expenses.

The same Circuit Court, in Dunn and McCarthy v. Commissioner, 1943, 139 F. 2d 242, reversed a decision of the Tax Court in a case whose principles are applicable here; and it discussed the case of Welch v. Helvering, supra, distinguishing it in a way which we find quite persuasive. The president of the taxpayer there had committed suicide after having borrowed from seven of taxpayer's top ranking salesmen the total of $20,523.92. Although taxpayer was under no legal obligation to make good these losses, it did so; and the Tax Court upheld the Commissioner's deficiency assessment, rejecting taxpayer's deduction of these payments as ordinary and necessary expenses. The Tax Court found that "There was no indication that if the loans were not paid the petitioner would lose either customers or its salesmen." The Second Circuit Court used this language (139 F.2d 243–244) in setting aside the Tax Court's action:

"If this [the Tax Court's finding quoted last supra] means merely that no salesman threatened to resign and no customer threatened to withdraw his account if the loans were not paid, the finding is correct. But if it means that failure to pay would have no effect upon the loyalty of the salesmen or the good will of the customers, we think that the finding is not supportable. It was the unanimous opinion of the directors that a failure by the corporation to recognize its moral obligation would not only impair the attitude of the salesmen toward the company but also would affect adversely the opinion of customers who learned of it. To us this seems a self-evident inference * * *. Thus it seems clear that the outlay was made for the purpose of conserving the good will of salesmen and of customers and actually accomplished that purpose.

"Such an expenditure of corporation funds would seem to be an 'ordinary and necessary' expense in carrying on the business. The opinion of the Tax Court does not question the judgment of the petitioner's directors in thinking that their action was an appropriate and helpful course to follow 'and to that extent what was done might be regarded as necessary', but holds that it was not an 'ordinary' expense. Reliance for this view is put upon Welch v. Helvering * * *. On the facts the case is plainly distinguishable from the case at bar. Welch made a capital outlay to acquire good will for a new business. In the present case the payment was an outlay to retain an existing good will, that is, to prevent loss of earnings that might result from destroying such good will by failing to recognize the company's moral obligation. Moreover, we do not think that under the circumstances of the present case the expenditure was 'in a high degree extraordinary.' It was the kind of outlay which we believe many corporations would make, and have made, under similar circumstances."

And in United States v. E. L. Bruce Co., Inc., supra, the Court of the Sixth Circuit, citing with approval Harris & Co. and Heller & Son, supra, and distinguishing Welch v. Helvering, rejected contentions of the United States quite similar to those made by respondent here.

Moreover, the undisputed proof that taxpayer was forced to do business as a commission merchant, dealer or broker of perishable commodities under the strict requirement of Chapter 20A of the Perishable Agricultural Commodities Act, 7 U.S.C.A. § 499a et seq., places him in a much more favorable position in his contest with respondent than was true in the cases cited and discussed supra. This taxpayer was forced to acquire, and had possessed for many years, a license to

engage in those businesses.[12] To acquire and hold such a license,[13] the taxpayer was required to abstain from any unfair conduct, described in detail in said section, including a provision making it unlawful for any commission merchant, dealer or broker "to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had * * *." The chapter contained a requirement making it mandatory upon the Secretary of Agriculture to "refuse to issue a license to an applicant (1) if he finds that the applicant has previously been responsible in whole or in part for any violation of the provisions of the chapter for which a license of the applicant, or the license of any partnership, association, or corporation in which the applicant held any office * * * was revoked under the provisions of section 499h of this title." [14]

It is hardly conceivable that the Secretary under the undisputed facts contained in this record and the terms of said statute, which are about as stringent as language could make them, would have renewed petitioner's license to continue his profitable Texas business unless he made good on the debts of the three corporate businesses even assuming that they were conducted as normal corporate operations in Idaho and Oregon. This is particularly true under the undisputed testimony concerning the extent to which reliance was placed upon the standing and credit of petitioner.

It is clear from the foregoing that the Tax Court reached a conclusion from undisputed facts which is not supported by law. The Decision of the Tax Court is accordingly reversed and the cause is remanded for recomputation of the tax in line with this opinion.

Reversed and remanded.

---

12. 7 U.S.C.A. § 499c.

13. Ib. § 499b.

14. Petitioner quotes and relies upon § 499e, carried in the pocket parts for 1960 of Title 7 U.S.C.A., the following provision which the respondent does not challenge or refer to in his brief:

"(e) The Secretary may refuse to issue a license to an applicant if he finds that the applicant, or in case the applicant is a partnership, any general partner, or in case the applicant is a corporation, any officer or holder of more than 10 per centum of the stock, has, within three years prior to the date of the application, been adjudicated or discharged as a bankrupt, or was a general partner of a partnership or officer or holder of more than 10 per centum of the stock of a corporation adjudicated or discharged as a bankrupt * * *."