RELMA D. ORRELL AND JOYCE Q. ORRELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
ORRELL v. COMMISSIONER
Docket No. 4014-76.
United States Tax Court
T.C. Memo 1979-129; 1979 Tax Ct. Memo LEXIS 397; 38 T.C.M. (CCH) 577; T.C.M. (RIA) 79129; April 5, 1979, Filed *397 Held: Petitioner's advances to a corporation in which he was a stockholder and an employee were not dominantly motivated to protect his job and salary as an employee. The advances were nonbusiness debts. Held,further: The nonbusiness debts did not become totally worthless in 1972 and no deduction is allowable under section 166(d) for that year. Myron Moscovitz and I. Marvin Burstein, for petitioners. Patrick E. Whelan, for respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined a deficiency in petitioners' 1972 income tax of $1,667.98. The issues for decision are: (1) Whether under section 166, I.R.C. 1954, [1] petitioners are entitled to a bad debt deduction in 1972 with respect to three promissory notes; and (2) if not, whether petitioners are allowed a trade or business expense deduction in 1972 with regard to these notes. FINDINGS OF FACT Some facts have been stipulated and are so found. Petitioners Relma D. Orrell and Joyce Q. Orrell, husband and wife, resided in Somerville, N.J., when their *398 petition was filed. Joyce Q. Orrell is a petitioner only because the couple filed a joint return (with the District Director at Newark, N.J.), for 1972, and references herein to petitioner will be to Relma D. Orrell alone. Petitioner was employed by Royal Typewriter, Inc., from 1951 to 1965, where he was engaged in various sales and managerial positions. He was employed from 1965 to June 1968 at Perfect Films, Inc., as a vice-president in their consumer products division. He gained knowledge of the importing business in both positions. Petitioner became dissatisfied with his position at Perfect Films and in June 1967 he began to seek other employment. Although he had been unsuccessful in finding another job, despite strenuous efforts, including the mailing of several hundred resumes, he voluntarily terminated his employment at Perfect Films in late April 1968. He continued on the Perfect Films payroll until June 1968, earning an annual salary of $23,000. Petitioner incorporated Sedgco Enterprises, Inc. (hereinafter Sedgco) on January 11, 1968, in the State of New York. At the time of the incorporation the petitioner was looking for a suitable position working for another company. *399 He formed Sedgco so that he would have a corporate shell available in case a business opportunity arose. During the summer of 1968 Wesley Beckwith, who was formerly one of petitioner's superiors at Royal Typewriter, Inc., was also unemployed. Petitioner and Beckwith joined in seeking a business opportunity. Through an advertisement in the newspaper they learned that Basket Corporation of America (hereinafter Basket Corporation) was for sale. They began investigating Basket Corporation in July 1968. Basket Corporation was in the business of importing sewing baskets from the Far East and marketing them domestically. Beckwith had experience in marketing and petitioner had experience in importing. Being favorably impressed by Basket Corporation and its potential, petitioner and Beckwith decided to buy the business in August 1968. In order to activate Sedgco and acquire the assets of Basket Corporation, it was necessary for petitioner and Beckwith to obtain assurance from the Chase Manhattan Bank that the bank would extend a $300,000 line of credit to Sedgco. Upon receiving verbal approval for the line of credit from the bank, petitioner and Beckwith proceeded to negotiate for *400 the purchase of the assets of Basket Corporation. As of October 4, 1968, when the first Board of Directors' meeting of Sedgco was held, the terms of the purchase agreement were still subject to negotiation. On or about October 1, 1968, it was agreed that John O. Forster would become a stockholder of Sedgco along with petitioner and Beckwith.Forster was the sole shareholder of Basket Corporation at one time and continued to be a stockholder and employee of Basket Corporation during the negotiations for the purchase of the assets of Basket Corporation. Various methods of financing Sedgco were considered by petitioner, Beckwith, Forster, and the Chase Manhattan Bank during the course of negotiations. As of September the bank was willing to extend its line of credit based or capital of $30,000 and loans from Beckwith and petitioner totaling $56,400. The bank was concerned with having a certain amount of money in the corporation regardless of how it was designated. The contract for the purchase of assets of Basket Corporation by Sedgco was dated October 7, 1968. [2] *401 When it was activated, Sedgco had 30 shares of capital stock. Petitioner subscribed to 15 shares at $1,000 per share. Beckwith subscribed to 5 shares at $1,000. At the time Sedgco was purchasing the assets of Basket Corporation, John O. Forster and his wife *402 Stella owned 10 shares of the capital stock of Basket Corporation. By an agreement dated October 4, 1968, the Forsters exchanged their 10 shares of Basket Corporation stock for the remaining 10 shares of Sedgco stock. The transfer of the Basket Corporation stock represented a reduction of $10,000 of the purchase price Sedgco would pay for the assets of Basket Corporation. Sedgco bought the assets of Basket Corporation subject to its liabilities. The opening entry in Sedgco's general journal indicates that Sedgco acquired assets of $270,673.56 subject to liabilities of $167,173.47. The net of assets in the amount of $103,500.09 was paid to Basket Corporation from funds received from the sale of its stock in the amount of $30,000 and the balance from loans received from the shareholders of Sedgco. The closing for the sale of Basket Corporation's assets to Sedgco took place on October 7 or 8, 1968. Petitioner, Beckwith, and Forster were directors of Sedgco. Petitioner was president of the corporation and Beckwith and Forster were vice-presidents. The "Loans Payable-Officers" account in Sedgco's general journal reflects total advances by officers on October 1, 1968, of $73,500.09. *403 The advances to Sedgco from the individual officers as of that date were $36,750.05 from the petitioner, $12,250.02 from Beckwith and $24,500.02 from Forster, proportionate to their respective stockholdings. An entry on the account as of October 31, 1968, reflects additional advances from the officers as follows: Petitioner, $75,000; Beckwith, $42,500; and Forster, $10,000. A second entry as of October 31 reflects that Sedgco repaid $40,129.50 to petitioner, $13,376.50 to Beckwith, and $24,502.99 to Forster. A third entry on the account as of October 31, 1968, shows advances to the corporation from petitioner, Beckwith, and Forster in the amounts of $4,510.15, $1,503.39, and $3,006.76, respectively. The total advances to Sedgco by its officers as of October 31, 1968, were $132,011.40. Advances from the individual officers as of that date were $76,130.70 from petitioner, $42,876.91 from Beckwith, and $13,003.79 from Forster, which was not proportionate with their stockholdings. In a letter to the Chase Manhattan Bank, Sedgco confirmed that it had assumed liability for the repayment of the bank's loan to Basket Corporation of America in the amount of $165,560.93, pursuant to an *404 agreement dated October 7, 1968. On October 7, 1968, petitioner entered a subordination agreement with Sedgco for the benefit of the Chase Manhattan Bank. In the agreement Sedgco is designated as the borrower, the Chase Manhattan Bank as the bank, and petitioner as the undersigned. Paragraph four of the agreement is as follows: The undersigned will not ask, demand, sue for, take or receive from the Borrower, by set-off or in any other manner, the whole or any part of any moneys principal or interest, now or hereafter owing by the Borrower to the undersigned, nor any security therefor, unless and until all indebtedness of the Borrower to the Bank, whether now existing or hereafter arising, direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, and whether arising directly between the borrower and the Bank or acquired outright, conditionally or as collateral security from another by the Bank, shall have been fully paid with interest. Advances by Beckwith and Forster were similarly subordinated. Petitioner understood subordination to mean that the bank had priority over his advances to Sedgco in the event that something went wrong with *405 the company. He also understood that he would have to get permission from the bank if he wanted to withdraw any of his money from the company. By agreement dated October 7, 1968, petitioner also personally guaranteed payment of any financial obligation due from Sedgco and its subsidiary, Basket Corporation, to the Chase Manhattan Bank. On October 11, 1968, Sedgco executed a general security agreement to the benefit of the Chase Manhattan Bank to secure payment of all liabilities owed by the corporation to the bank. In a financial statement submitted to the Chase Manhattan Bank on October 4, 1968, petitioner indicated that he had approximately $94,000 on deposit in banks, $30,000 in marketable securities, and no liabilities. This substantial amount of cash resulted from the sale of securities in September 1968. The International Longshoremen's Association went on strike on October 1, 1968. A temporary restraining order was issued on that date restraining the strike. On October 16, 1968, an injunction under the Taft-Hartley Act was issued further restraining any strike until December 20, 1968. The International Longshoremen's Association abided by the restraint, but commenced *406 a strike on December 24, 1968, which lasted until February 13, 1969, closing ports from Maine to Texas. This materially affected Sedgco's ability to obtain the sewing baskets it imported from the Far East for resale. The "Loans Payable-Officers" account in the general ledger of Sedgco reflected the total advances by officers and the advances of each individual officer through September 30, 1969. As of that date, the account still reflected advances by petitioner, Beckwith, and Forster in the amounts of $76,130.70, $42,876.91, and $13,003.79, respectively. [3] Thereafter the account reflected only total advances to the corporation, without segregated accounts for each officer. Petitioner's loan account to Sedgco and later to Summer Enterprises, Inc., varied from month to month during the years 1968 through 1972 due to intermittent additional advances to the *407 corporations and repayments from the corporations. By an agreement dated November 30, 1970, petitioner purchased John O. Forster and Stella Forsters' stock and notes of Sedgco. Petitioner received the Forsters' promissory notes of Sedgco with a face value of $10,000 and their 10 shares of stock in exchange for $7,000. The price paid for the stock was $1.00 per share. By a similar agreement, petitioner purchased Beckwith's stock and notes of Sedgco. On or about December 1, 1970, petitioner was the sole stockholder of Sedgco. Although interest on the purported loans to Sedgco was accrued on its books, no interest was ever paid to the officers. On December 8, 1970, petitioner entered into an agreement with Summer Enterprises, Inc. (hereinafter Summer), whereby he exchanged all the outstanding stock of Sedgco and its wholly owned inactive subsidiary, Basket Corporation, for 200,000 shares of the stock of Summer. As a result he owned a 20-percent interest in Summer.(Other major shareholders had 49-, 20-, and 8-percent interests, respectively.) Pursuant to the agreement, he accepted three notes from Summer in the total amount of $113,511.40 as full and complete satisfaction of Sedgco's *408 outstanding notes and loans. The said notes and loans represented the advances made by petitioner, Beckwith, and Forster to Sedgco. The notes received from Summer were noninterest bearing and were due on January 1, 1973 ($50,000), August 1, 1973 ($30,000), and January 1, 1974 ($33,511.40). In addition, petitioner agreed to waive his right to receive any accrued interest on advances previously made to Sedgco. Also on December 8, 1970, petitioner entered into an agreement with Sedgco and Basket Corporation, Summer not being a party, in which the notes from Summer to petitioner were secured by a security interest in the inventory and accounts receivable of Sedgco and Basket Corporation. (See discussion, fn. 9). Petitioner agreed to subordinate all indebtedness so secured in favor of any loan or line of credit from a financial institution to Sedgco. Sedgco was a profit-making company with net assets worth about $39,000 at the time it was acquired by Summer.Subsequent to the acquisition, Summer continued to operate Sedgco as Summer's subsidiary with petitioner serving as Sedgco's president. Summer was strictly a holding company with no bank account. In addition, petitioner was *409 employed by Summer as secretary after the exchange of his Sedgco stock for 20 percent of Summer's stock. Summer wanted petitioner to sign a formal employment contract, but he refused to sign one. Petitioner received a $19,140 salary for Summer's fiscal year ended February 28, 1971. His anticipated salary for the ensuing fiscal year was $26,000. On July 10, 1972, petitioner's attorney sent a letter to David Menashe, the president of Summer. It was alleged that the agreement whereby Summer's indebtedness to petitioner was secured by the assets of Sedgco and Basket Corporation had been breached. Demand was made for immediate payment of the notes due from Summer to petitioner totaling $113,511.40. Also, demand was made that the collateral for the loan, being basically the assets of Sedgco and Basket Corporation, be turned over. Petitioner entered an agreement with Sedgco on September 14, 1972, whereby all accounts receivable were assigned to him subject to rights of the National Bank of North America. Sedgco also delivered any and all inventory to petitioner. As of July 31, 1972, Sedgco showed total current assets with a book value of $189,086 and total liabilities apart from *410 debt to petitioner of $137,906. Petitioner filed suit to collect the notes, and as a result Summer went out of business in 1972.
Petitioner recovered $11,359.74 of the liability due from Summer by a series of checks drawn to his order by Sedgco between May 4, 1973, and January 18, 1974. Substantially all other creditors of Sedgco were paid in full. ULTIMATE FINDINGS OF FACT Petitioner's dominant motivation with regard to his Summer debt was not related to his employment.
Petitioner's Summer debt did not become totally worthless in 1972.
OPINION The principal issue here is whether petitioner is entitled to a bad debt deduction in 1972 under section 166(a) or (d)[4] *412 with respect to three noninterest bearing Summer notes held by petitioner due on January 1, 1973 ($50,000), August 1, 1973 ($30,000), and January 1, 1974 ($33,511.40). Petitioner claimed a bad debt deduction of $80,000 on his return for 1972. By amendment to his petition petitioner now claims a bad debt deduction of $101,060.87. This is derived by subtracting from the $113,511.40 total face amount of the notes $11,359.74 paid to petitioner by Sedgco on the notes during 1973 and 1974 and $10,000 recovered by petitioner from *411 notes previously paid to Beckwith and Forster, and adding thereto $8,909.21 paid by petitioner to the Internal Revenue Service by check dated March 25, 1975, on a 100-percent penalty assessed against Sedgco. Among other arguments, respondent claims no bad debt deduction should be allowed on the ground the advances made by petitioner to Sedgco constituted contributions to capital, the loss from which is not deductible under section 166. Although a bona fide debt, not a contribution to capital, is required for a deduction under section 166, see sec. 1.166-1(c), Income Tax Regs., we believe respondent's focus is on the wrong debtor in deciding this debtequity question. Whatever the nature of petitioner's advances to Sedgco, as of December 8, 1970, when petitioner accepted three notes from Summer in the total amount of $113,511.40 as full and complete satisfaction of Sedgco's outstanding debt owed to petitioner, he became a creditor of Summer. These notes are the source of the claimed bad debt deduction [5] and whether petitioner received these notes in return for debt or equity in Sedgco has no direct bearing on the bona fides of his purported debtorcreditor relationship with Summer.Since respondent has not challenged this debtor-creditor *413 relationship, we do not believe respondent's initial point is well taken. [6] Having determined that the debt owed petitioner was valid, we turn to respondent's next argument that the debt was nonbusiness and thus subject to the restrictions under section 166. Direction on whether a debt is business or nonbusiness begins in section 166(d)(2): (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Petitioner was both a full-time employee (a business interest) and a shareholder (a nonbusiness interest) of the debtor corporations. If, *414 as petitioner asserts, the claimed bad debt centered on, or was proximately related to, his employment rather than his shareholdings, it would be a business bad debt. United States v. Generes,405 U.S. 93, 101 (1972). In making this determination, the Supreme Court held in Generes and the parties agree that the proper measure is that of dominant motivation. 405 U.S. at 103. Before discussing the parties' arguments, perhaps it would be helpful to review briefly the history of petitioner's loans that are the subject of his bad debt claim. As of October 1, 1968, petitioner had loaned Sedgco $36,750.05. This was at or about the time Sedgco was activated.Petitioner was Segco's president and a 50-percent shareholder. By the end of October 1968, petitioner's total loans to Sedgco had grown to $76,130.70. Petitioner's loan account to Sedgco varied from month to month thereafter due to intermittent additional advances and repayments. The record discloses no substantial change in the loan balance until November 30, 1970, when petitioner purchased the Sedgco stock and notes held by Sedgco's other two shareholders. As a result, as of November 30, 1970, Sedgco apparently owed petitioner $113,511.40. *415 At that time petitioner was still Sedgco's president, but he also had become its sole shareholder. Eight days later, petitioner exchanged all his stock in Sedgco for stock representing a 20-percent interest in Summer and accepted three notes from Summer in the total amount of $113,511.40 "as full and complete satisfaction of all prior [Sedgco] loans and notes." [7] Petitioner also became secretary of Summer. Although petitioner terminated his status as a creditor and shareholder of Sedgco, he continued to be its president. (Sedgco operated as a subsidiary of Summer.) On September 14, 1972, after petitioner brought suit against Summer to collect on the three notes, petitioner obtained an agreement from Sedgco and Basket Corporation, signed in their behalf by petitioner, pledging all of their inventories and accounts receivables as security for the payment of $113,511.40 indebtedness of Sedgco to petitioner, but with reference being made to the three notes given petitioner by Summer. See fn. 9. With this background, petitioner argues: That petitioner's dominant motive in acquiring the debt was *416 to protect his employment and his salary therefrom, rather than to protect his investment.Petitioner's and his co-stockholders' dominant motive in advancing their loans was to protect their salaries received from their employment by Sedgco and petitioner's employment by Summer.Petitioner's only source of earned income was his salary from full-time employment with Sedgco (and later Summer). His corporate employer (Sedgco), as petitioner testified, would fold up if he did not advance loans to it at the request of the bank. And, if it folded up, he would lose his only source of income--his salary from the corporation. Implicit in petitioner's argument is the assumption that the debt he claims went bad in 1972 was "created or acquired" in connection with his business, see sec. 166(d)(2)(A), or "incurred" in his business, see sec. 166(d)(2)(B), early in Sedgco's corporate existence. [8]
Respondent, though also disputing whether the loans to Sedgco were business debts, argues that since the Summer notes represented new loans the *417 business versus nonbusiness debt question depends upon petitioner's dominant motivation with respect to Summer, not Sedgco. [9] We agree with respondent that analysis must focus on whether petitioner's dominant motivation in making his loans to Summer was employment related. As indicated in petitioner's *418 December 8, 1970, agreement with Summer, Sedgco's debts to petitioner were terminated since petitioner accepted three notes from Summer as full and complete satisfaction of Sedgco's prior loans. Otherwise stated in relation to section 166(d), the Summer debt owed petitioner was "created or acquired," see sec. 166(d)(2)(A), or "incurred," see sec. 166(d)(2)(B), on December 8, 1970. We are aware of no authority for tacking any prior Sedgco history to the Summer notes for section 166(d) purposes. [10]
Applying the dominant motivation standard as of December 8, 1970, when the debt in issue was created, acquired, or incurred, we have no convincing evidence to show that petitioner's dominant motivation in exchanging the Sedgco notes for the Summer notes was to protect petitioner's employment as a corporate *419 executive. The only real evidence offered by petitioner bearing on motivation was his testimony. He testified that he and Beckwith activated Sedgco to provide them with something to do and salaries, but that testimony is self-serving and also relates only to Sedgco. Petitioner testified further that the principal reason he entered into the transaction with Summer was because he could not run Sedgco by himself but wanted to see it continue because it was a profitmaking company, and the product of Summer's operating company, leather wallets and purses, would fit in nicely and compliment Sedgco's products. Petitioner was offered an employment contract by Summer but refused to accept it. According to United States v. Generes,supra at 104, we are to compare the risks against the potential rewards and give proper emphasis to the objective rather than to the subjective in determining the motivation for the loans. Petitioner's after-tax salary from Summer was about $16,00o (based on a pre-tax salary of $19,140). This was considerably less than his investment in Sedgco and Summer at the time he agreed to accept Summer's notes in exchange for Sedgco's indebtedness to him. According *420 to the prospectus issued by Summer in January of 1972, Sedgco had a net asset value of $39,000 when its stock was exchanged for Summer stock. Petitioner also had $113,511.40 invested in Sedgco and later in Summer in the form of loans. This and the large disparity between the amount of the loans and petitioner's salary (here $113,511.40 against about $16,000 after taxes), see Kelson v. United States,503 F. 2d 1291, 1293 (10th Cir. 1974), suggest that petitioner's dominant motivation for taking debt from Summer was not to protect his employment and accompanying salary. We also regard petitioner's refusal to sign a formal employment contract with Summer, despite Summer's urging to do so, as inconsistent with any claim that his Summer debt centered on protecting his employment status. [11] *421 Without a contract petitioner, who was only a 20-percent stockholder in Summer, had no assurance of continuing employment with Summer.In short, we find that petitioner's dominant motive for his Summer debt was not centered on his trade or business as a corporate executive. His Summer debt therefore was a nonbusiness debt under section 166(d). [12] *422 A loss on a nonbusiness debt shall be treated as sustained only if and when the debt becomes totally worthless, and no deduction shall be allowed for a nonbusiness debt which is recoverable in part during the taxable year. Sec. 1.166-5(a)(2), Income Tax Regs.
We find that the debt did not become totally worthless in 1972. On July 10, 1972, petitioner, through his attorney, demanded full payment of Summer's obligation to him. He also demanded that the collateral for the loan, being basically the assets of Sedgco and Basket Corporation, be turned over to him. Petitioner entered an agreement with Sedgco on September 14, 1972, whereby all accounts receivable were assigned to him subject to rights of the National Bank of North America. Sedgco also delivered any and all inventory *423 to petitioner. As of July 31, 1972, Sedgco had total current assets of approximately $189,000 consisting of cash, accounts receivable, and inventory and total liabilities, not including debt to petitioner, of approximately $138,000. Assuming that there was no material change in Sedgco's balance sheet from July until September 1972, or until the end of the year 1972, [13] there was a balance of some $51,000 from which petitioner could have anticipated future recovery. In fact, he did make partial recovery in 1973 and 1974. Absent a preponderance of facts to the contrary, the debt was not totally worthless and is not deductible as a bad debt in 1972. In the alternative, petitioner claims that his "net payment of $101,060.87 of the debts" should be deductible as a trade or business "expense" under section 162(a) because "the payment" was to protect his credit standing, which was necessary to continue his employment. The authorities cited by petitioner, Gould v. Commissioner,64 T.C. 132 (1975), and Lutz v. Commissioner,282 F. 2d 614 (5th Cir. 1960), are inapposite because they involved payments *424 made and debts assumed by the taxpayer with respect to other creditors of corporations that related to his business or employment. Here petitioner made no such payments, that is, he incurred no "expense," and his claim is without merit. Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue, unless otherwise specified.↩
2. All facts relating to the agreement between Sedgco and Basket Corporation are gleaned from the testimony of witnesses and statements made in, and entries made on, other exhibits. The written agreement between Sedgco and Basket Corporation, if there was one, was not offered in evidence. The evidence indicates that Sedgco bought the assets of Basket Corporation and assumed its liabilities. The evidence also indicates that Basket Corporation became a wholly owned subsidiary of Sedgco, but how this came about is not explained. For purposes of this case, we assume that under the agreement of Oct. 7, 1968, Sedgco purchased all the assets of Basket Corporation and assumed its liabilities by paying to Basket Corporation in cash the difference between the value of its assets and the amount of its liabilities assumed. We need not know how it acquired the stock of Basket Corporation, although the evidence does indicate that Sedgco acquired the 10 shares of Basket Corporation owned by Forster in exchange for the 10 shares of Sedgco stock he received.
3. The account indicates that on Mar. 15, 1969, petitioner advanced Sedgco an additional $7,500 and Beckwith advanced an additional $6,000, with no additional advance from Forster. Petitioner was repaid $3,000 on Apr. 15, 1969 and $4,500 on Sept. 30, 1969. Beckwith was repaid $1,500 on Apr. 15, 1969, and $4,500 on June 30, 1969.↩
4. Sec. 166(a) provides: (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially wortelss debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
(d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The interaction of these provisions is such that if the notes held by petitioner represented nonbusiness debts they must be wholly, not just partially, worthless in 1972 to be deductible. Sec. 1.166-5(a)(2), Income Tax Regs. Also, nonbusiness bad debts are treated as short-term capital losses rather than as ordinary deductions. Sec. 166(d)↩.
5. Although the debt-equity issue is moot at this point, there is convincing evidence that petitioner acted like a prudent outside creditor with respect to his three notes: Petitioner filed suit to collect the notes, and as a result Summer went out of business in 1972. ↩
6. Respondent agreed that the Summer debt is the debt in issue in arguing the debt was nonbusiness. See discussion, infra↩.
7. The quoted language is from the agreement signed by Summer and petitioner on Dec. 8, 1970.↩
8. The dominant motive of the other Sedgco shareholders should be immaterial even if petitioner's assumption were valid. Ex. 2 of sec. 1.166-4(d), Income Tax Regs.↩
9. To add to the confusion, Summer is not a party to the agreement securing the notes. In that Dec. 8, 1970, security agreement between Sedgco and Basket Corporation as debtors, and petitioner, as the secured party, it is recited that Sedgco is indebted to petitioner in the sum of $113,511.40, which is evidenced by promissory notes. Presumably this security agreement is in error because the notes were issued by Summer; the propectus prepared for a public offering of Summer stock, dated Jan. 14, 1972, states that when Summer acquired Sedgco, petitioner received notes from Summer totaling $113,511.40 representing loans to Sedgco cancelled in favor of new notes from Summer; petitioner sued Summer for collection of the notes; and on his 1972 income tax return petitioner claimed that his bad debt resulted from a loan to the corporation in which he was a 20-percent stockholder, which was Summer.↩
10. Even if the exchange of Sedgco stock for Summer stock were to constitute a sec. 368(a)(1)(B) reorganization, under sec. 381 none of Sedgco's tax history is absorbed by Summer. Also, the exchange of Sedgco indebtedness for Summer notes would appear to be a taxable exchange, compare Rev. Rul. 69-142, 1969-1 C.B. 107↩, and even the holding period for the Summer notes would begin anew.
11. Compare Mann v. Commissioner,T.C. Memo. 1975-74, where the taxpayer's insistence upon an employment agreement under similar circumstances supported business debt treatment. 12. We would reach the same conclusion were we determining petitioner's motivation for his advances to Sedgco. The advances made by petitioner and his co-stockholders from time to time to Sedgco appear to have been made on the demand of the bank that had extended a $300,000 6ine of credit to Sedgco. This line of credit was necessary in Sedgco's business to pay for merchandise purchased abroad at the time the merchandise was put aboard a ship in a foreign port. The advances were thus made in connection with the business of Sedgco and petitioner's investment therein and were in no way directly or proximately related to petitioner's business as an employee of Sedgco. See Whipple v. Commissioner,373 U.S. 193 (1963). At times petitioner's advances amounted to almost his total life savings. We are not convinced that petitioner would have put this much on the line to protect his job and salary, which was small in comparison. We believe petitioner's acquisition of the stock and loans of Beckwith and Forster and the subsequent transfer of all the stock and obligations of Sedgco to Summer was indicative of his desire to expand the business and increase the value of his interest therein rather than a desire to protect his job. We do not believe petitioner's dominant motivation, see United States v. Generes,405 U.S. 93↩ (1972), in advancing funds to Sedgco was to preserve his job and salary with Sedgco; rather, it was to promote the business of Sedgco and his investment therein.
13. We have no evidence of either Sedgco's or Summer's financial status after July 31, 1972.↩