SPROUSE, Circuit Judge:
 

 The Commissioner of the Internal Revenue Service appeals from the judgments of the United States Tax Court which found no deficiencies in the income tax returns of the taxpayer, M. L. Eakes Co., Inc., for the tax years ending June 30, 1973, 1974, 1975 and 1977. The Commissioner had assessed deficiencies totalling $42,675.00. The Tax Court held that payments by taxpayer of the bankruptcy-discharged debts of its predecessor were necessary and ordinary expenses and thus deductible under section 162(a) of the Internal Revenue Code of 1954.
 
 [1]
 

 The taxpayer, a North Carolina corporation located in Greensboro, North Carolina, was incorporated in 1959 under the name Marion Enterprises, Inc. From 1959 to 1970, taxpayer’s sole activity was to own certain real property which it rented to M. L. Eakes, Inc. (MLE). All of taxpayer’s outstanding stock was owned by Mary W. Eakes until December 30, 1970, when she transferred fifty percent of it to her husband, Marion L. Eakes.
 

 MLE was incorporated under the laws of the State of North Carolina in 1957. From 1957 to 1970, MLE engaged in the business of industrial air-conditioning, contracting and sheet metal fabrication. From 1957 to 1969, Mr. and Mrs. Eakes owned all the outstanding stock of MLE. Mr. Eakes was the president and chief operating officer of both MLE and taxpayer, and MLE relied almost exclusively on his ability and reputation in its effort to successfully compete in its business.
 

 Prior to forming MLE in 1957, Mr. Eakes had acquired extensive experience and expertise in industrial air-conditioning. In 1945, he began work for a New York company which was one of the major industrial air-conditioning and engineering firms in the United States. From 1954 to 1957, he was president and chief executive officer of Conditioned Air, another major industrial air-conditioning firm. He then organized MLE which was financially successful for over ten years.
 

 During the period from 1968 to 1970, however, MLE suffered repeated financial setbacks. In 1969, taxpayer reduced the annual rent paid by MLE in order to ease its problems, and invested $175,000 in MLE, for which taxpayer received 1,750 shares of $100 par value preferred stock of MLE.
 

 Despite the aid of taxpayer, MLE was unable to meet its obligations to trade creditors. In February 1970, MLE made a voluntary assignment of its assets for the benefit of its creditors. The creditors formed a committee to liquidate MLE and elected to distribute the proceeds on a pro-rata basis. MLE made a final cash distribution to the creditors in 1971 and filed a certificate of completed liquidation with the North Carolina Secretary of State in February 1972. Each creditor received an average of 63 cents on the dollar. The unpaid balance owing to creditors after MLE’s liquidation was approximately $110,000.
 

 From March 7, 1970, until December 1, 1970, Mr. Eakes engaged in the business of
 
 *219
 
 industrial air-conditioning, contracting and sheet metal fabrication as a sole proprietor. He finished some of the uncompleted work of MLE and began to take on other contracts.
 

 On December 1,1970, Mr. Eakes transferred the assets and liabilities of his individual proprietorship to taxpayer, in exchange for a note in the amount of $31,652.67. Since then, taxpayer has been engaged in the same line of business in the same geographical area
 
 [2]
 
 as were MLE and the individual proprietorship. Taxpayer’s name was changed on December 8, 1970, to Marion L. Eakes Company, and on April 25, 1977, to M. L. Eakes Company, Inc.
 

 Upon taking over the industrial air-conditioning, contracting and sheet metal fabrication business of the proprietorship, taxpayer had no available lines of credit. It found that it was impossible to get credit from suppliers unless it agreed to pay the unsatisfied debts of MLE. Credit from suppliers was a necessity for taxpayer to do business. Accordingly, as the need to deal with suppliers holding unsatisfied debts of MLE arose, taxpayer began making commitments to pay off these debts. Some of MLE’s creditors extended credit based on taxpayer’s promise to pay the old company’s debts, while others extended credit only after their accounts were paid in full. In addition, in order for taxpayer to do business in Virginia, it had to obtain a license from the Virginia Registration Board for Contractors. Without a commitment to pay the residual debts of MLE, taxpayer would not have been granted this license.
 

 Taxpayer made payments to the trade creditors of MLE in the amounts and over the periods shown below:
 

 Taxable Year Ending Amount
 

 June 30,1971 $ 3,546.00
 

 June 30,1972 15,088.97
 

 June 30,1973 18,471.32
 

 June 30,1974 8,469.37
 

 June 30,1975 30,160.91
 

 June 30,1977 31,805,00
 

 TOTAL $107,541.57
 

 Taxpayer deducted these payments as part of its cost of goods sold in all of the years involved, except the taxable year ending June 30, 1974, when the payments were deducted as moving expenses.
 

 The Commissioner disallowed the deductions for 1973, 1974, 1975 and 1977, and asserted corresponding deficiencies of $8,866; $4,066; $14,477; and $15,266; the taxpayer petitioned for redetermination. After trial the Tax Court held that the payments in question were both “ordinary and necessary” and, hence, were deductible under section 162(a) of the Internal Revenue Code of 1954. On appeal the Commissioner concedes that the payments were “necessary” within the meaning of the statute, but contends they do not qualify as deductions because they were not “ordinary”.
 

 The Tax Court reasoned that the payments were “ordinary” because they were made to promote and protect an existing business, inasmuch as the same business had been conducted since 1957 by MLE and Mr. Eakes and, alternatively, because by the time the payments were made taxpayer had established itself in the industrial air-conditioning, contracting and sheet metal fabrication business. Since we agree that the payments were ordinary within the meaning of section 162, because they were essential to the day-by-day operation and made in connection with the ongoing operation of the plaintiff’s business, we need not address the alternative holding.
 

 The single thrust of the Commissioner’s argument is that the debts of the predecessor corporation were paid in order to establish, rather than to preserve, credit for the new corporation, and thus were outlays of capital. The taxpayer contends that the payments were business expenses required for the continuity of an ongoing operation.
 

 The narrow issue involved here is not new, and was presented in the seminal case of
 
 Welch v. Helvering,
 
 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933). In
 
 Welch
 
 the taxpayer, a former secretary of a bankrupt
 
 *220
 
 grain business, later became a commission agent for another grain company. The taxpayer agreed to pay the debts of the bankrupt business in order to solidify his credit and standing and to reestablish his relations with customers. The Supreme Court upheld the Commissioner’s disallowance of a deduction, and stressed the factual nature of section 162(a) issues. In considering whether the expenditures in issue were “ordinary” under section 162, Justice Cardozo stated:
 

 Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack... . The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms of conduct that help to stabilize our judgment, and make it certain and objective. The instance is not erratic, but is brought within a known type.
 

 Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle.
 

 Id.
 
 at 113-115, 54 S.Ct. at 9 (citation omitted).
 

 To say that given factual circumstances amount to a capital outlay is to settle the issue of deductibility with the ultimate legal conclusion of non-deductibility. It is simple to postulate that the cost of establishing a new credit reputation is a capital outlay. It is difficult, however, to differentiate which prior debt payments were to establish a new credit reputation and which to preserve an old one. The approach of the Supreme Court in
 
 Welch
 
 requires us to not lose sight of the basic inquiry — what is “ordinary?” As
 
 Welch
 
 emphasizes, this is answered by sifting the commercial facts of life of the business claiming the deduction. Each claim for a deduction rises or falls on the facts underlying it, but general guidance is provided by cases resolving factual issues in similar settings.
 

 In
 
 Lutz v. Commissioner,
 
 282 F.2d 614 (5th Cir. 1960), taxpayer, a produce broker, paid the debts of three corporations which continued farming operations formerly conducted by him personally. The Tax Court denied the deductions taken by taxpayer on the basis that the losses were incurred not by him, but by the corporations. The Fifth Circuit reversed on the ground that failure to make the payments would jeopardize taxpayer’s own business, even though he was not legally obligated to pay the debts.
 

 In
 
 Carl Reimers Co., Inc. v. Commissioner,
 
 211 F.2d 66 (2d Cir. 1954), taxpayer, a radio and magazine advertising agency, paid its president’s share of the residual debts of another advertising agency that had been liquidated in bankruptcy some thirteen years earlier. Payment was made as a condition to the taxpayer receiving “recognition” (credit and commissions) from an association of newspaper publishers. The Second Circuit held that the payments were not deductible as a necessary and ordinary business expense under section 162 because they were made to expand into a new line of advertising, never before conducted by the predecessor businesses.
 

 The task of the reviewing court in these cases, as in the case at hand, was to sift through the particular facts surrounding the businesses involved to determine whether the deductions were “ordinary” — whether they occurred ordinarily in the business
 
 *221
 
 community, the commercial mores of which govern each taxpayer’s actions.
 

 In the case
 
 sub judice,
 
 the payments that were made over a period of years to extinguish the remaining trade debts of MLE were admittedly extraordinary occurrences in the corporate life of taxpayer. Indeed taxpayer in its own financial statements so described these expenditures. However, taxpayer’s witnesses in the Tax Court below testified that within the business community as a whole similar situations occur with some frequency. The construction industry relies heavily on credit from suppliers, and the suppliers within this industry generally have a policy of not allowing credit to a successor company if its predecessor left residual debts owing the suppliers.
 

 At trial, taxpayer introduced the testimony of a representative cross-section of creditors of MLE. Norman G. Ridenhour, Treasurer and Controller of Carolina Steel Corporation since 1950, testified that while the voluntary payment of the debts of a liquidated corporation does not happen often, it has occurred in his experience several times over the years. Donald J. Brady, longtime Greensboro area District Manager for the Trane Company, a nationwide manufacturer of air-conditioning equipment, testified that while bankruptcy and liquidations were uncommon, voluntary commitments to pay the debts of the liquidated corporation were common. Lonnie K. Thompson, Senior Vice President and Treasurer of Dillard Paper Company for 42 years, testified that several instances similar to taxpayer’s had occurred in his experience. Henry T. Rogers, Treasurer and General Credit Manager of J. M. Tull Industries, Inc. for 23 years, recalled at least a dozen similar instances. In addition, taxpayer’s witnesses testified that they and other suppliers in the Greensboro area had established procedures for deciding on credit requests under circumstances similar or identical to taxpayer’s, i.e., businesses in which the principal involved had previously had debts discharged in bankruptcy or liquidation. The established policy of suppliers was to require a commitment identical to those made by taxpayer.
 

 The evidence presented to the Tax Court amply supports that court’s conclusion that these payments were both a practical business necessity for taxpayer in its day-to-day operations and of an ordinary character within the taxpayer’s business community.
 
 [3]
 

 We therefore affirm the decision of the Tax Court.
 

 AFFIRMED.
 

 [1]
 

 . I.R.C. § 162(a) provides in pertinent part:
 

 There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business....
 

 [2]
 

 . Primarily North Carolina, Virginia and South Carolina, although it has some business in Maryland, Georgia, Tennessee, Alabama and Mississippi.
 

 [3]
 

 .
 
 Cf. Welch, supra,
 
 290 U.S. at 115, 54 S.Ct. at 9. (“[N]othing told us by this record ... permits us to [find that the expenses] ... are ordinary ... and necessary according to the ways of conduct and the forms of speech prevailing in the business world.”)
 
 See also Lutz, supra
 
 at 618.